# CHARLESTON.

## BOWERS *v.* DICKINSON.

Submitted January 23, 1888.—Decided February 4, 1888.

30  70ม
44  682

30  709
48  461

30  709
54  660

30  709
63  151
f63  447

1. PARTITION—TENANTS IN COMMON.

If in a chancery suit for partition of lands held by tenants in common the individual land of one of the tenants in common is divided without objection with the other lands held in common and the court afterwards by its decree confirms the report of the commissioners, who so divided the lands, but incorporates in the decree certain provisions, whereby the common-law obligations of tenants in common are changed, such as a provision relieving each tenant in common from his obligation to warrant generally the title of each of his co-tenants to the land assigned to him, and also provisions to modify the rights of the parties arising from dividing without objection the land belonging to one of them individually, as if it were the land of all tenants in common, and all the parties are fully acquainted with all the facts equally and have acted in perfect good faith towards each other, though the court not properly enter such a decree so modifying the rights and responsibilities of the parties as tenants in common, if the decree is not appealed from, the rights and obligations of the tenants in common

will be as fixed by such decree, and not as they would have been under the circumstances at common-law, had such decree not modified their rights and obligations. (p. 718 *et seq.*)

2. EJECTMENT—INSTRUCTIONS.

If in the trial of an ejectment-suit the plaintiff offers evidence to prove, where one of the corners of a survey is located, and the defendant offers evidence to show, where another corner of the survey is located, though they can not both be correct, unless the courses and distances of the survey are much changed, it would be erroneous for the court to instruct the jury, that, if they found the corner, which the plaintiff had attempted to establish, was correctly located by him, they should locate the survey by its courses and distances beginning at this established corner. All, that the jury can be properly told, is, that it is competent for them to so locate such survey, thus leaving it to them, if they believe that the defendant's evidence has also satisfactorily established a corner, to so change and modify the courses and distances as to make the points established both by the plaintiff's evidence and by the defendant's evidence corners in the survey as located by the jury. (p. 732 *et seq.*)

3. SURVEYS—DESCRIPTIVE CALLS.

The descriptive calls in a survey, such as, "near the land" of a named person, must yield in locating a survey to establish corners as well as to locative calls. (p. 736.)

4. GRANT—CALLS AND DESCRIPTIONS.

The calls and descriptions in an entry of vacant land must be controlled by the calls and descriptions in the grant issued on such entry. (p. 739.)

Statement of the case by GREEN, JUDGE:

This was an action of ejectment brought in the Circuit Court of Kanawha, in May, 1887, by William Bowers and William K. Tompkins, against Mrs. Sally J. Dickinson and her six infant children defendants to recover a certain tract of land containing 1,532 acres 2 rods and 3 poles in Kanawha county, West Virginia, about 19 miles above the city of Charleston, on the south side of the Kanawha river, and lying upon the waters of the Mile Branch of Kelley's creek and Laurel Fork of Witcher's creek.

The declaration contained three counts. The first was in the name of these two plaintiffs; the second in the name of one of the plaintiffs, and the third in the name of the other. In each count the plaintiffs described the land claimed as

above and set it out by metes and bounds. The damages claimed for the unlawful withholding of the premises was $500.00. The declaration was in the usual form.

On June 1st, 1877 the court made the following order:

" This day came the parties, by their attorneys, and thereupon the defendants pleaded not guilty and put themselves upon the country, and the plaintiffs likewise, and by consent it is ordered, that Abel P. Sinnett, a surveyor of this county, do go upon the land in controversy in this suit on such day, as any of the parties may request, reasonable notice thereof being given, and survey and lay off the same as either party shall require and return seven fair plats and three reports thereof to the court, and that any one of the justices of this county do then and there meet him and examine and take the depositions of such witnesses, as shall be produced by any of the parties, which depositions shall be returned with the said plats and reports; and the sheriff of this county is to attend such survey and remove force if any shall be offered."

On June 19th, 1878, the death of William Bowers was suggested and the suit was revived in the name of Jacob E. Bowers, John L. Bowers and William T. Bowers, trustees, as parties plaintiff. On March 31st, 1884, a guardian *ad litem* was appointed for three of the infant defendants, and by this guardian *ad litem* they pleaded not guilty, and issue was joined. The deaths of two others of the infant defendants were suggested, and the suit was revived by consent against the other defendants, their heirs, and Sally J. Dickinson and Mary Dickinson, a daughter then adult; and they pleaded not guilty, and issue was joined as to them, and the infant defendants by their guardian *ad litem* also pleaded not guilty, and issue was joined as to them. The defendants disclaimed to own any part of the land mentioned in the declaration except so much as is enclosed in green lines and designated by the numbers 7, 6, 5, 5½ to 7 as laid down on surveyor Sinnett's map, which was filed in the cause. This contained about 80 acres of land.

A jury was sworn to try these issues; the trial lasted three days, when the jury returned a verdict for the defendants on April 4th, 1884. The plaintiffs moved the court to set

aside this verdict and award them a new trial which the court took time to consider, and on the 12th of April, 1884, rendered the following judgment:

" This day came the parties by their attorneys and thereupon the motion of the plaintiffs to set aside the verdict of the jury rendered herein and to award them a new trial having been argued and considered, the said motion is overruled ; thereupon it is considered by the court, that the plaintiffs take nothing by their declaration, and that the defendants go hence without day and that said defendants recover from said plaintiffs their costs by them in this suit expended including an attorney's fee of $10.00."

The plaintiffs asked for a new trial because the verdict was contrary to the law and the evidence, which the court refused to grant, and a bill of exceptions was taken setting forth all the evidence and instructions asked and refused.

The plaintiffs traced by deeds and wills regularly proven their title to the land named in the declaration back to John Steele, to whom the Commonwealth of Virginia granted a patent for 27,000 acres dated November 15, 1796. A copy of this patent may be found in *Patrick* v. *Dryden*, 10 W. Va. 389–393. The defendant in like manner traced their title to John Skile, to whom the Commonwealth of Virginia granted a patent for 420 acres dated November 20th, 1793. There was no controversy as to the true location of the Steele survey, or that its external boundaries included the land in the declaration named. But while it was clear that the Skile survey was included in the external boundaries of the Steele survey, and this appeared on the face of the Steele patent, his survey being what is known as the inclusive survey, yet there was very much conflict as to its true location, and as to whether the Skile survey of 420 acres did or did not cover any portion of the land named in the plaintiff's declaration. If it was located as the defendants claimed, there was an interlap between the land claimed by the plaintiffs and the Skile survey of about 80 acres, which was the only subject of controversy in this suit, the defendants having disclaimed title to all the land named in the declaration not contained in this interlap, when the 420 acres of the Skile

survey was located as the defendants claimed its true location to be.

The defendants traced their title to the land in controversy through John J. Dickinson, who by deed dated April 10th, 1867, conveyed it to Henry Clay Dickinson, and he by his will admitted to probate May 4th, 1871, devised it to the defendants, his wife and children.

The plaintiff, William H. Tompkins, and many others were tenants in common with said John J. Dickinson and Henry Clay Dickinson of a portion of the 27,000 acre survey of John Steele. In the year 1866 John J. Dickinson and Henry Clay Dickinson and some others of these tenants in common instituted a chancery suit in the Circuit Court of Kanawha county for the partition among all the tenants in common of this portion of the 27,000 acres owned by them, making all their co-tenants, who were not plaintiffs, defendants. At the June term, 1866, the Kanawha Circuit Court appointed by its decree commissioners to make partition of this portion of the 27,000 acres among the numerous tenants in common, having due regard to the quantity, quality and value of the land and designating the portion of the whole to be assigned to each party. This decree concluded thus : " And said commissioners are further directed first of all before partition to ascertain any interfering claims, reservations or conflicting titles to any portion of the lands herein directed to be partitioned, and which in their opinion may be valid, and which are held by others not claiming under the Steele patent of 27,000 acres, and deduct the same and not consider them in their partition and report the same to the court for further action or adjudication." Under this decree they made their report, that they went upon the land, proceeded to partition and assign to the several parties named in the decree their several shares setting them out severally by metes and bounds, and after that, they say in their report, " And the above lots are assigned with risk of title to the parties above, and the parties are to hold any land included within any adversary claim within their respective boundaries if they can."

On the 2d day of January, 1868, a decree was entered in this cause, which commenced as follows : " It having been

suggested that one of the complainants, John J. Dickinson, has departed this life, but upon his death he had conveyed his interest in the tract of land in the bill mentioned to H. C. Dickinson, who is also a party complainant, on motion this suit is abated as to said John J. Dickinson." This decree approves and confirms the report of the commissioners and adjudges, " that the parties stand seized of the lots of land respectively assigned to them in severalty, that is to say." The decree then proceeds to name each of the parties and to declare that he or they, naming them, shall stand seized of specified lots designated in the report and plat, describing each lot by its metes and bounds. Among the lots so assigned is one to William H. Tompkins, the plaintiff in this suit, designated as " E," containing 1,675 acres set out by metes and bounds, which include the land in controversy in this ejectment-suit; and the court in the said decree " adjudged that William H. Tompkins stand seized thereof." After all the lots as stated in the commissioner's report had been in this manner assigned to the parties to this suit to be held by them in severalty, this decree proceeds: " And it is further ordered and decreed, that the several parties, to whom the lands are assigned in this decree take the lands embraced in any adversary claims, which are within the bounds of their several tracts of land, so far as any title can be conferred upon them, which is derived from the Commonwealth's grant to John Steele, and that they take all the lands herein assigned to them with all risk of title, and nothing in this decree contained is to be construed as passing any title other than that, which John Steele and those deriving under him derived by his grant from the Commonwealth of Virginia; and the rights of the adversary claimants (if any they have) are to remain and be as if this decree had not been entered; and it is further adjudged, ordered and decreed, that Wiliam A. Quarrier, who is hereby appointed a special commissioner for that purpose, do in the room and stead of and for and in the name of all the parties, who are described in the bill as having title to the land herein mentioned, make, execute, deliver and acknowledge a deed of partition conveying the several lots of land to the parties, to whom they are respectively assigned."

This deed of partition was accordingly made in the names of all the parties, including Henry C. Dickinson as one of the parties of the first part, and William H. Tompkins, the plaintiff in this ejectment suit, of the seventh part. And by this deed all the other parties, including Henry C. Dickinson, "in consideration of one dollar and in consideration of the premises, do grant unto the party of the seventh part three certain tracts of land" describing them by metes and bounds, including this lot "E" containing 1,675 acres, which lot covers the land in controversy in this ejectment suit. This deed concluded thus: "And this deed further witnessseth that the several parties to this deed take and hold the lands embraced in adversary claims which lie within the bounds of their several and respective tracts or lots of land as far as any title can be conferred upon them which is derived through the Commonwealth title and grant to John Steele, and they, the parties to this deed, take and hold all the land herein conveyed to them respectively with all risks of title, and nothing in this deed contained is to be construed as passing any title or estate other than that, which John Steele and those claiming under him derive by his grant from the Commonwealth of Virginia; and the right of adversary claimants (if any there be or any they have) are to remain and be as if this deed had not been executed.

"In witness of all which the parties hereto have by William A. Quarrier, special commissioner as aforesaid, signed their names and affixed their seals the day and year first above written."

Then there is signed to this deed the name of each of the parties, 59 in number, and his seal affixed by William A. Quarrier, special commissioner.

This deed was dated March 2d, 1868, and acknowledged for recordation and admitted to record December 31st, 1868.

After the evidence on both sides was closed, which evidence is stated, as far as it is deemed necessary, in the opinion of the court, the plaintiffs asked the court to give the jury nine several instructions, to the giving of each of which the defendants objected. The court gave the first four of these instructions and refused to give the last five, to which ac-

tion of the court in refusing to give the five last instructions the plaintiff excepted. The defendants asked the court for seven instructions, to each of which the plaintiff objected; but the court gave them all, and the plaintiffs excepted. These instructions so granted and refused, so far as deemed necessary to a full understanding of the case, are stated in the opinion of the court.

The jury found a verdict for the defendants; the plaintiffs asked that the verdict might be set aside and a new trial awarded, which the court refused and entered up a judgment in accordance with the verdict, to which action of the court the plaintiffs excepted. A writ of error has been awarded on the petition of the plaintiffs to the judgment of the court rendered on April 13th, 1882.

*T. A. Brown* and *S. A. Miller* for plaintiffs in error.

*W. A. Quarrier* and *W. Mollahan* for defendants in error.

GREEN, JUDGE:

Before considering the questions involved in this case I will state a few undisputed propositions of law applicable to tenants in common and to the legal effect of partition between them, whether made by themselves or the court; as a distinct understanding of the law, which controls the parties having such relation to each other, will enable us the better to interpret the decrees and proceedings in the chancery suit for partition referred to in the statement of the case, which must be interpreted, before we can decide certain very important points involved in some of the instructions offered on the trial of this case before a jury.

First, then, tenants in common occupy such a relation to each other, that one of them can not buy an outstanding or adversary title to the whole or any part of the land held by them in common for his own benefit to the exclusion of his co-tenants. To allow this to be done would be repugnant to a sense of refined and accurate justice, and it would be immoral on the part of the co-tenant, as it would be in violation of the reciprocal obligation to do nothing to the prejudice of each other's equal rights. The law will not tolerate one co-tenant in buying up an adverse title to disseize and

expel his co-tenant. Such purchase will operate for the benefit of all. See *Williams* v. *Gray*, 3 Greenl. (8 Me.) 1207; *Jones* v. *Stanton*, 11 Mo. 433; *Venable* v. *Beauchamp*, 3 Dana 326; *VanHorn* v. *Fonda*, 5 Johns. Ch'y 407.

So far is this obligation imposed on the tenant in common, that the law will not permit one who has been a tenant in common, even after partition has been made, to buy an outstanding title adverse to the common title of him and his former co-tenant and to assert it against him. See *Venable* v. *Beuchamp*, 3 Dana 326.

When partition has been made by tenants in common by compulsion in a suit brought for the purpose, each one of the partitioners becomes a warrantor to all the others to the extent of his share, so long as the privity of estate continues, but no longer; and therefore if one tenant in common aliene the land allotted to him, and the alienee should be evicted, as the privity had been destroyed by the alienation, there would be no liability by reason of the implied warranty to make recompense either to the alienee or to the parcener, from whom he bought. See *Jones* v. *Stanton*, 11 Mo. 433; 2 Min. Inst. 442; 1 Co. Lit. 718 sit. 173*b* and 178*a*.

Every partition implies, as we have seen, an implied warranty, if the co-tenant elects to so regard it; but if he does not so elect, then it implies a condition entire, the breach of which gives the co-tenant evicted by an adversary claimant of the land assigned to him either in whole or in part a right to enter upon the whole land or bring an action therefor, just as though no partition had been made. See Vin. Part. 2 pl. 5, 6, and 1 Inst. 174; Bro. Par. pl. 34; Co. Lit. 208; 4 Rep. 121*b; Feather* v. *Strohvecker*, 3 Pem. & W. 508.

This being the law, can tenants in common, when they make partition, expressly agree, that there shall be no warranty as to the title of each other; or can they agree, that there shall be no condition, that, if one of the tenants in common is ousted by an adverse claimant to the whole or any part of the land assigned to him to be held in severalty, he can at his option treat the whole partition as a nullity and enter on the entire tract, as if no partition had been made, or in other words agree when the partition is made, that it shall be absolute and not conditional; or if the parti-

tion is made by a decree of the court, can the warranty or condition be declared by the court in its decree to have no operation or effect?

It does seem to me, that by express agreement or by the express terms of the decree of partition this might be done; for as the warranty or condition is only implied by the law, the parties can by express agreement in the partition dispense with such warranty or condition, or the court with the consent of the parties in making its decree of partition may dispense with this warranty or condition. And if the court has in fact expressly dispensed with them in the decree, if such decree has not been appealed from or reversed, it will be binding upon parties to the partition and their privies. See *Ward* v. *Nark*, 5 Watts 279. But to dispense with this implied warranty or condition the language used by the parties in the agreement for partition or by the court in the decree of partition, it seems to me, should be clear and explicit, and the intention to dispense with them ought not to be left to be inferred from doubtful language, nor should effect be given to language in the way of changing the results of partition long established beyond what clearly appears to have been the purpose of the parties or of the court.

These views obviously spring from the fiduciary relation existing between tenants in common. In fact almost the first decisions in England growing out of the fiduciary relation of parties and undertaking to define the duties and obligations of fiduciaries to others holding fiduciary relations were cases of co-parceners and tenants in common in a very rude age. But as civilization advanced, these principles have been applied as well as extended in their application to other fiduciary relations. While all the principles, which are applied to various fiduciary relations, are not the same, depending, as they do upon, and varying with the particular character of the relation, yet there are some broad principles, which are applied to every species of fiduciary relation.

One of these principles applicable alike to all persons holding fiduciary relations is, that a person who occupies a fiduciary relation to another is bound not to exercise for his own benefit and to the prejudice of the party, to whom he stands in such relation, any of the powers or rights or any of

the knowledge or advantage of any description, which he derives from such confidential relation. They must exercise to each other in all cases *uberrima fides.* See *Newcomb* v. *Brooks,* 16 W. Va. 32.

When applied to tenants in common it is held, for instance, that one tenant in common can not oust another except by bringing home to the co-tenant a knowledge, that he has disclaimed and disavowed his co-tenant's title by open, continued and notorious disloyal acts, so as to preclude all doubt as to the character of his holding. Without distinct proof of this his possession will never be presumed to be adverse because of his duty to his co-tenant to act with *uberrima fides* to him in all matters springing out of their fiduciary relation. See *Boggess* v. *Meredith,* 16 W. Va. 1 ; *Hudson* v. *Putney,* 14 W. Va. 561. These are applications of the general principle we have stated peculiar to tenants in common, co-parceners and the like.

Another case where the principle, I have stated as applicable to all fiduciaries, is applied in a special manner to tenants in common is, where in the partition of land between them one of the tenants in common knowingly permits lands of his own adjoining the land held by him in common with his co-tenant to be divided as though it was a portion of the lands held in common, and a part of the land, which had been the exclusive property of one, was assigned to his co-tenant. In such case the one, who had owned the land individually could never recover from the one, who had been his co-tenant, any portion of the land, which had thus been with his consent assigned to his co-tenant in the partition, even though it were shown, that this co-tenant was aware, that a portion of the land, which had belonged individually to his co-tenant, was in the partition assigned to him ; for it could not be regarded as *uberrima fides* in him to so act, as the result would be, that his co-tenant, if this land was permitted to be recovered of him, might have far less than his equal share of the common property ; and the tenant in common, who had owned the property so divided, would be required to continue to treat it as common property, as he did at the time of the partition. As he then surrendered his individual claim to it, it must be regarded as common prop-

erty at that time, it having been treated as such by both of the tenants in common, each having had perfect knowledge of the facts.

But, if, when such partition was made, it was explicitly agreed, that, if thereafter it could be shown, that any portion of this individual's land so divided was actually included within the bounds of the land assigned to his co-tenant, the right to recover it by suit should remain in the co-tenant, to whom it originally belonged, he could maintain such suit; for such an agreement would be binding, just as the agreement in a partition, that the general warranty and condition, of which we have spoken as implied in every partition as the consequence of the fiduciary relation of the parties, might be dispensed with, and each party required to take all the risks of title, would be binding. But just as in that case the agreement should be a clear and explicit agreement, and the intention to confer such right of suit should not be left to be inferred from doubtful language, the rule of law being, that when a fiduciary claims to be discharged under a contract from the obligations imposed on him by such relation, the court should after most jealous and scrupulous examination be satisfied, that such contract was made, and that in the obtaining of such contract there was no fraud, no concealment and no advantage taken of the person, to whom such fiduciary relation was held. All this is required by the *uberrima fides*, which the law always requires between persons holding any fiduciary relation to each other, such, for instance as tenant in common, in all dealings between them in relation to their common property.

It is well settled that a deed of partition, whether made by tenants in common themselves or under a decree of the court, does not destroy the fiduciary relation between them (1 Thomas Coke 726 N. T.) because privity is not destroyed between them, the tenants in common have after partition the right to aid from each other; that is, they have the right to ask the court to call in help from another person who has an interest in the thing contested. It gives strength to the party praying aid and to the other likewise by giving him an opportunity to avoid a prejudice towards his own right, 1 Jac. Law. Dict., Art. Prayer. Hence the relations of tenants

in common remain the same as to the title after partition as before, so that a tenant of one parcel can not place himself in an attitude hostile to his former co-tenant. See *Venable* v. *Beauchamp*, 3 Dana 324. Tenants in common after partition made are not considered as holding under each other, so that, if one is sued in respect to his title to his property, he can call the others in aid or vouch them to defend as warrantors. They are considered as holding under the original or paramount warrantor. See Wash. Real Prop. vol. 1, p. 438, Book 1, ch. 13, sec. 7 & 16, and the authorities there cited.

But this fiduciary relation, though not destroyed by the simple partition of the common-law however effected, may, by contract made at the time of the partition, be thereafter destroyed, as it would be by one tenant in common conveying his interest to the other.

But, as has already been said, when this fiduciary relation is claimed to have been destroyed under a contract, made at the time of the partition, the court must not only be satisfied after a jealous examination, that there was such a contract, but also that there was no concealment or advantage taken by one tenant of the other. One who claims the benefit of such an agreement or decree of partition, if the agreement was inserted in such decree, would have to show satisfactorily, that no advantage was take of his co-tenants by concealment or in any other manner, and that they actually understood the character of the agreement or could have understood it without any investigation being made by them; but the agreement on its face or such decree should taken in connection with the proceedings in the partition suit, show the exact character of the contract whereby a tenant in common claims to be relieved from obligations imposed on him by reason of his fiduciary character. When this is claimed to have been done by contract or by the decree of partition, it must appear from the contract and proceedings and decree, that the tenants in common must have understood, how such provision in the contract or deed would operate, and that nothing was concealed from any of the parties, the concealment of which could have prevented them from fully understanding such decree or contract.

We will now apply these principles of law to the case before us. The facts disclosed by the evidence and shown by the bill of exceptions taken by the plaintiff, so far as it is necessary to state them, are as follows: John J. Dickinson and H. C. Dickinson, under whom the defendants claim the land in controversy, were in 1857 and thereafter tenants in common with the plaintiff, W. H. Tompkins, and the persons under whom the other plaintiffs claim, in a large tract of land, the upper portion of the Steele survey, which covered the land in controversy. This survey was patented to John Steele on December 1st, 1794, and the patent conveyed by metes and bounds 40,757 acres; but after taking out the included surveys, which in all contained 13,757 acres, there were left 27,000 acres conveyed to Steele. The following reservation was made in this patent: "But it is always to be understood that the survey, on which this grant is founded, includes 13,757 acres, the property of sundry persons, viz.: 200 acres surveyed to Archer Mathews six miles up Elk on the south east side of the river."

Then follow fourteen other tracts lying within the exterior boundaries of the Steele survey of various sizes surveyed for various persons named, the locations of the lands so reserved being described with about the same accuracy as the survey of 290 acres to Archer Mathews, and they are all stated to have been surveyed prior to 1790. Among these reservations are the following: "Jacob Skile's 420 acres opposite Price's on the hill, William Price 1,000 acres joining on Wilcher's creek and Carrol's land surveyed 1790, entries on 200 acres for Michael Lee opposite where Col. Donally lives on Kanawha river." Then follow in the patent five other entries of like general description and of different sizes to different parties; and then the patent proceeds: "And 861 acres of other claims not here inserted exclusive of the above quantity of 27,000 acres, all of which have a preference by law to the warrant and right, upon which this grant is founded; liberty is reserved, that the same shall be firm and valid, and may be carried in grant or grants, and this grant shall be no bar either in law or equity to the confirmations of the titles to the same as before mentioned and reserved with its appurtenances, to have and to hold the said tract of

land with its appurtenances to the said John Steele (except as before excepted) and to his heirs forever."

The patent of Jacob Skile for 420 acres referred to as excepted in this John Steele grant was issued November 20th, 1793, and thus describes the land: "420 acres in the county of Kanawha near the land of Joseph Carrol and the land of William Price including the head of a branch which empties into the Kanawha river on the north side opposite William Price's, and the head of a branch which empties into the Kanawha river by the house of Joseph Carrol, and bounded as follows: Beginning at a large black oak on a ridge near the head of Carrol's branch and running S. 30° E. 180 poles to a chestnut and dogwood, N. 70° E. 100 poles to a chestnut-oak on a point of a ridge; thence due E. 95 poles to a poplar; thence N. 10° E. 146 poles to a beach and black oak, N. 30° E. 110 poles to a white oak and hickory near the head of the branch that empties into the Kanawha opposite William Price's, N. 39° W. 100 poles to a chestnut on a ridge, N. 76° W. 326 poles to the beginning." The entry, on which the survey was made, the basis of this patent to Jacob Skile was issued, described this land as follows: " 500 acres on the head waters of a large branch that empties into the Kanawha nearly opposite to William Price's field to include the head waters of a branch that empties into the Kanawha at Joseph Carrol's house and several other branches of the Kanawha for quantity."

The title of Jacob Skile was regularly traced to Charles Arbuckle; and this 420 acres of land was then sold for non-payment of taxes by him on September 17th, 1858, and bought by John J. Dickinson for fifty three cents and a proper deed was made to him by the clerk of Kanawha County Court on October 18th, 1858. When this deed was made to him, as well as when he purchased the 420 acres of land, he was a co-tenant in common with one of the plaintiffs in this ejectment-suit and with the persons under whom the other plaintiff in said suit claimed, and a large number of other persons interested in this tract of 27,000 acres conveyed by this patent to Steele.

On the principles we have laid down, John J. Dickinson had a perfect right to purchase and hold for his individual

use this 420 acres of land patented to Jacob Skile, as it was not an adverse title to the 27,000 acres patented to Steele, and of which he was a tenant in common with a large number of people including the plaintiffs in this suit.

The Skile survey was not a title adverse to the Steele survey patent, because by the Steele patent it was expressly recognized as a superior title, and while it was included in the exterior boundaries of the Steele survey, yet it was not paid for by Steele, and the Steele patent did not profess to convey it to Steele. John J. Dickinson had as much right to purchase for himself and not for the benefit of co-tenants in common with him this 420 acres patented to Skile, as he had to purchase for himself Jacob Skile's survey of 40,000 acres, which lay outside of the Steele survey and bordering upon it, and which the Steele patent calls for running with it 1872 poles in all through eight courses. Neither of these Skile surveys was adverse to that of Steele, and any tenant in common of the Steele survey could purchase and hold either of these Skile surveys for his individual benefit without violation of any duty he owed to his co-tenants. The purchase by John J. Dickinson and the deed made to him by the clerk for this 420 acres of land patented by Jacob Skile gave to him and those claiming under him a title thereto superior to the title of any one claiming under the Steele patent, although when he purchased it, he was a tenant in common with many others claiming the 27,000 acres under the Steele patent.

The question is: Has any conduct of John J. Dickinson or those claiming under him estopped him from claiming this 420 acres of land against any of the parties who were tenants in common with him of the Steele survey of 27,000 acres? The facts claimed to have this effect appearing in the evidence are the following: John J. Dickinson conveyed this 420 acres to H. C. Dickinson, the ancestor of the defendants in this suit on April 20th, 1867; but before the making of the deed, in 1866, John J. Dickinson, Henry C. Dickinson and other tenants in common of the upper part of the Steele survey of 27,000 acres brought a suit for a partition of this land owned by them under the Steele patent against William H. Tompkins and a large number of other tenants in

common with the plaintiffs in the chancery suit brought in the Circuit Court of Kanawha county. The peculiar proceedings and decree in that suit are claimed by the plaintiffs in error here to have established, that the defendants parties claiming under John J. Dickinson and Henry C. Dickinson, are estopped from setting up any claim to the land in controversy in this ejectment suit.

I have copied in the statement of the case the peculiar proceedings and decrees in this suit. I propose now to consider and decide, what is their meaning and what effect, if any, they have in estopping the defendants in this ejectment suit from setting up claim to that portion of the 420 acres, which was according to the verdict of the jury included in the land assigned to one of the plaintiffs in this suit and to a person, under whom the other plaintiffs claim. The language of the decree appointing commissioners to apportion by metes and bounds the land held by the parties to the suit as tenants in common tracing their title to the Steele patent is as follows :

" Said commissioners are further directed first of all and before partition to ascertain any interfering claims, reservations and conflicting title to any porton of the land herein directed to be partitioned, and which in their opinion are valid, and which are held by others not claiming under the Steele patent of 27,000 acres, and deduct the same, and not consider them in the partition, and report the same to the court for further action or adjudication."

By "reservations" in this decree, 1 presume, was meant the various patents within the exterior boundaries of the Steele survey of 27,000 acres, which were expressly reserved and not granted by the patent to Steele, such as the survey in the patent hereinbefore described by metes and bounds and said in the Steele patent to be opposite Price's on the hill, William Price's 1,000 acres joining on Witcher's creek, and Carrol's land surveyed in 1790, and others heretofore described as reserved in this patent. If this be what is meant by " reservations," it is from what we have said obvious that all these reservations should have been deducted before the partition and not merely those not held by persons claiming under the Steele patent, that is, I suppose, the parties to

this suit plaintiffs and defendants, all of whom were tenants in common. This direction to the commissioners, if this were its meaning, instructed them not to deduct this Skile survey owned by John J. Dickinson, one of the plaintiffs and tenants in common of the Steele 27,000 acre survey, before the partition, that is, they were instructed to divide this 420 acre Skile survey, as if it belonged to all the tenants in common. Because it had been purchased by John J. Dickinson and conveyed to him individually, they regarded it as purchased for the benefit of all the tenants in common, thus putting it on the same footing as conflicting and adversary titles purchased by any of the tenants in common.

This we have seen was erroneous as these reservations admitted in the Steele patent to be superior titles and not conveyed by it stood on a very different footing from adversary titles within the boundaries of the Steele grant not admitted to be superior to it, and which were conveyed by the Steele patent expressly. Such adversary title within the Steele grant or conflicting with it, if purchased by any tenant in common of the Steele survey, must be regarded as purchased for the benefit of all the tenants in common of the Steele lands, and the commissioners were properly directed in effect to so regard it. In obedience to this decree the commissioners treated improperly this 420 acres of land, the Skile survey, as belonging to the tenants in common of the Steele survey, with which we have seen it did not conflict, though they properly excluded from the partition other surveys, which like it were within the exterior boundaries of the Steele survey, but not conveyed by the Steele patent nor conflicting with it, and which were owned by others than the tenants in common of the Steele land, as for instance the Price survey of 1,000 acres.

This report assigned by metes and bounds to the tenants in common severally their respective portions and concludes as follows: " The above lots are assigned with risk of title to the parties above, and the parties are to hold any land included within any adversary claim within their respective boundaries, if they can." This was a suggestion made by the commissioners apparently because they deemed it reasonable, as all the lands, which strangers had an adver-

sary claim to superior to the Steele title and valid, after careful investigation they had intended in accordance with the instruction of the court to exclude from the partition, and they doubtless thought that the title to all the land they had divided was probably valid, and that therefore it would be best to relieve each of the tenants in common of his common-law responsibility of warranting generally the lands assigned to his tenant in common.

They also probably thought that any future difficulty about the validity of the title of any of these tenants in common, which might arise from treating the Skile survey of 420 acres as a portion of the lands to be apportioned, would be avoided by the fact, that this tract could not be located as the surveyor, who attempted to locate it as the basis of the deed from the clerk of Kanawha county to John J. Dickinson, the purchaser of it at the sale for delinquent taxes, reported October 18, 1858: "I have never identified any of the corners or lines of said 420 acre tract; but according to its local description it must lie wholly within the Steele survey of 27,000 acres and is described as lying near the land of Joseph Carrol and the lands of William Price;"—and the commissioners probably thought, that even if this tract of 420 acres was located within the Steele survey, no difficulty about the validity of the title would arise in assigning to the Dickinsons their portion of these Steele lands, if they took care so to assign them, that the portion of the Dickinsons' would probably include these 420 acres. Accordingly they so assigned the portions of the land coming to those claiming under John J. Dickinson. The Circuit Court adopted the views of the commissioner; but as injustice would be done to those claiming under John J. Dickinson by this apportionment, if this Skile survey should ever be identified, as they would be required by it to take this 420 acres of land —the Skile survey—or much the greater part of it as their portion in this division of the common property, while they already had an individual title to it, and it really was no part of the common lands to be divided, as some relief to this injustice the court seems to have thought it would be proper in confirming this report to provide in the decree that if any portion of the Skile survey should, if it were

ever located, be found to lie outside of the metes and bounds of the land assigned to the parties claiming under John J. Dickinson, their title to such portion should be unaffected by the decree. This was done by the decree of January 2, 1868, after confirming the commissioner's report of the division, which had not been excepted to by any one, and assigning the lands to the tenants in common severally by inserting at the end of the decree this provision :

"And it is further adjudged, ordered and decreed, that the several parties, to whom lands are assigned in this decree, take the lands embraced in any adversary claims, which are within the bounds of their several tracts of land, so far as any title can be conferred upon them, which is derived from the Commonwealth's grant to John Steele, and they take all the lands herein assigned to them."

"And it is further adjudged, ordered and decreed, that the several parties to whom lands are assigned in this decree, take the lands embraced in any adversary claims, which are within the boundaries of their several tracts of land, so far as any title can be conferred upon them, which is derived from the Commonwealth's grant to John Steele, and they take all the lands therein assigned to them with all the risk of title, and nothing in this decree contained is to be construed as *passing any title other than that, which John Steele and those claiming under him derived by his grant from the Commonwealth of Virginia, and the rights of the adversary claimants (if any they have) are to remain and be as if the decree had not been entered.*"

The meaning of this provision in the decree seems clear. Each of the tenants in common was intended thereby to be relieved of his common-law obligation to warrant generally the land assigned by metes and bounds to each of his other tenants in common, and none of the tenants in common could under this decree claim any title against his cotenants except the title, which John Steele and those claiming under him derived by his grant from the Commonwealth of Virginia, and the rights of any of the tenants in common as adversary claimants of the land patented to Steele and belonging to the tenants in common, such as the claims of those claiming under John J. Dickinson, he having died

pending the suit, for the 420 acres, the Skiles survey, are to remain and be as if this decree had never been entered. That the last clause of this decree above italicized referred solely to the tenants in common, the parties to this chancery suit, is, it seems to me, obvious not only from the previous proceedings in the cause whereby claims to lands, which belonged to some of these tenants in common individually (the Dickinsons for example), had been divided as if they were common property—which must have been known to the court and all persons interested in the suit—but also because it was idle to state in the decree, that the rights of strangers to the suit should not be affected by the decree. The merest tyro in the law would know that the rights of strangers to the suit could not possibly be affected by this decree; and I can not conceive, that it was the purpose of the court to formally so declare; nor can I suppose, that this portion of the decree was so understood by any of the parties or their counsel.

This was not a consent-decree; but, as none of the parties to the suit ever appealed from it, the inference is, they were satisfied with the provisions, especially as it is most obvious, that it would have been reversed, had it been appealed from by any one injured by it. It is clear, that the court without the consent of the parties had no right to insert this last clause in the decree. Of course the Dickinsons, whose individual lands were thus divided, had the best ground to complain of this decree, and William H. Tompkins, who had, as it turns out, a portion of this individual land of the Dickinsons assigned to him as a tenant in common, was thus liable to lose it and had a ground of complaint of this decree better than that of the other tenants in common. They all had however ground of complaint, as they were all deprived of their right to insist that their title to their respective lands should be warranted generally by their co-tenants. On the other hand it is obvious, that all the co-tenants derived considerable advantage in the way of quieting their titles and relieving themselves from obligations imposed on them by law from this decree, and especially from the last clause of it, and as none of them appealed, we may regard them as tacitly assenting to what had been done.

92

The effect of one of the .terms of this decree was, as we have seen, to permit those claiming under John J. Dickinson to set up their individual claims to any portion of the Skile survey of 420 acres, which might turn out to have been assigned to any other tenant in common. This was done by them, they insisting that a portion of it lay within the bounds and metes of the lot of 1,675 acres assigned to William H. Tompkins. He and those claiming under John J. Dickinson could not set up any claim to this 420 acres, even if a portion of it was, when truly located, on the 1,675 acres assigned to William H. Tompkins, they being estopped from so doing by the facts, that John J. Dickinson, was a co-tenant with William H. Tompkins in the Steele land; and that no part of the Skile survey was, when properly lo= cated, on this 1,675 acres assigned to Tompkins.

From what we have said, if John J. Dickinson, or those claiming under him, did, as it is claimed, tacitly agree to have his 420 acres, Skile survey, divided as lands held in common with William H. Tompkins, though they were not subject to be so treated, yet neither he nor they would be estopped from claiming so much of this land as was assigned to William H. Tompkins as a co-tenant: provided, when this 420 acres were divided, it was further agreed that neither he nor they should be estopped by the division from setting up such claim, as we have seen from the decree of the court was the understanding; and, if such tacit agreement was entered into, there was no concealment by John J. Dickinson, or those claiming under him, of any facts; and the actual facts were all perfectly well known to all the parties equally, and the operation and effect of the tacit agreement, as expressed in this decree, was perfectly well understood by all parties interested; in other words, provided John J. Dickinson and those claiming under him acted, as they were bound to, with perfect good faith to his co-tenants. It seems to me that the proceedings in this chancery cause show that John J. Dickinson and those claiming under him have shown in all this matter *uberrima fides*, and therefore, are not estopped from setting up the claim they do in this ejectment-suit to a portion of this 420 acre Skile survey within the bounds of the 1,675 acres assigned his co-tenant, William H. Tompkins.

The material facts affecting this tacit agreement were that this 420 acre Skile survey was included in the exterior boundaries of the Steele patent of 27,000 acres; that by this patent this 420 acre survey was not conveyed, but that it was expressly excepted from the conveyance by this patent, because. it was admitted to be an older and superior title, and that it was a valid title; that no corner or line tree of this Skile survey of 420 acres could be found, and it was very difficult to locate it properly, though its general locality within the Steele survey, as shown by the grant, was known; that in partitioning the land the commissioners divided this 420 acre survey of Skile's as if it were a part of the land held in common by all those claiming under the Steele patent; but in making the division the land assigned to those claiming under John J. Dickinson, the owner of the 420 acres, was so located as to probably include the Skile survey, if that could ever be located.

All these facts were equally well known to all persons interested in this chancery suit necessarily, as they appeared from the proceedings themselves in this cause. The commissioners who divided the land knew all of them; the court knew them necessarily; and all the parties to the suit, and their counsel who took any part in the cause, must have known them. It is impossible that John J. Dickinson, or those claiming under him, could have concealed any of these facts, if he or they had been disposed to do so; and he and they knew no other facts bearing on this tacit understanding and agreement.

The decree of partition, entered with a knowledge of these facts, is, we have seen, unmistakable in its meaning. It is so worded that those knowing the facts must have comprehended its effect. So that there was, it seems to me, on the part of John J. Dickinson, and those claiming under him, *uberrima fides*, clearly indicated by the fact that, by the terms of this decree, they suffer far more injury than William H. Tompkins or any of the other co-tenants. This decree, or rather the tacit understanding on which it is based, is binding on all the parties to this chancery cause; and it does not estop the defendants in this ejectment suit in setting up the claim they did to the portion of the 1,675 acres assigned to

William H. Tompkins in this partition suit, which is covered by the Skile patent of 420 acres owned by the defendants in this ejectment-suit.

We have now only to consider whether the location of this Skile survey, as in effect found by the verdict of the jury, can be set aside by this court as a verdict contrary to the law and the evidence. We will state briefly the material evidence on this point as shown by this record. The location of this Skile survey of 420 acres, which, in effect, the jury found to be its correct location, the defendants undertook to prove, first, by proving that a chestnut oak tree stood at a point 6 on the map returned by the surveyor who did the surveying in this case; that it was on a ridge, and that it was anciently marked on one side as a corner tree, corresponding with the course of a line in the Skile patent of 420 acres; that the marks on said tree were blocked out of the same by surveyor Mathews, in 1871; that in blocking it he found it hollow, and there were 50 annulations between the bark and the hollow. This was claimed by the defendants as the seventh corner in the Skile patent, which was "a chestnut oak on a ridge." That, running from this as the seventh corner, the Skile survey, run by its course and distance, would, as claimed by the defendants, be represented by figures 6, 5, 4, 3, 2, 18 and 19, and that 5 would be near the head of Miles' branch. As shown by the surveyor's report, the call in the Skile patent at this place is "near the head of a branch that empties into the Kanawha river opposite Wm. Price's;" and that the lines of the survey as run above, as claimed by the defendants, would include the head of Carrol's branch and Mile branch. That the survey so run would be on the mountain.

They also proved that Joel Shrewsberry, an old citizen, who had land near the mouth of Carrol's branch since 1822, and was also one of the tenants in common of the Steele survey of 27,000 acres, about the year 1850, told Cole, a surveyor, to run the Skile survey of 420 acres, and to commence at a black oak near the head of Carrol's branch, and described to him how he would find the same, but he went afterwards and could not find the black oak. Another surveyor looked for this black oak and could not find it. This

was claimed by the defendants as the beginning corner of the Skile patent, described in it as "a large black oak on a ridge near the head of Carrol's branch." It corresponds with 19 on the map of the surveyor in this suit, where the Skile survey is laid down as the defendants claim, and it is near the head of the largest branch of Carrol's run. No marked tree of any sort was found there, nor were any ancient marked trees found in running the land as claimed by the defendants. This point 6 was a considerable distance inside of the boundaries of the land assigned William H. Tompkins in this chancery suit.

The plaintiffs, on the other hand, claimed that what they said was the fourth corner of the Skile survey, spoken of in it as a poplar, stood at a point 12 on the map of the surveyor in this suit; and they proved that a poplar, about the year 1857, standing at the point 12 on the map, was anciently marked on one side as a corner tree; that this tree was cut down by Page Stanley for boat gunwales, and in squaring it for that purpose a slab was split off about five feet from the ground; that after this slab was split off it was hewn some, and three hacks were found in the tree. This hewing of it after the slab was split off was not much. The annulations in the split-off slab were counted, and near these marks they counted 67 annulations in the slab which indicates that this poplar was marked as a corner near the date of the Skile survey. Assuming this as the fourth corner of the Skile survey, and running it off, no line trees or corners were found, but the survey would lie near William Price's survey, touching it at one point; it would also include the head of Carrol's branch, and also the head of branches which empty into Laurel fork of Witcher's creek. The Skile patent said the Skile survey lay near the land of Joseph Carrol and William Price, including the head of a branch which empties into the Kanawha river on the north side opposite William Price's, and the head of a branch which empties into the Kanawha river by the house of Joseph Carrol. It was also proven that, if the Skile patent was located as the plaintiffs claimed, it would touch none of the waters of Miles' branch; and it was further proven that, if the land was laid down as the defendants claimed, the nearest point of the Skile patent to William Price's land would be 230 poles.

Without going further into less important details of the evidence, it is obvious that there is very great uncertainty as to whether the location of this Skile survey, either as claimed by the plaintiffs or defendants, was satisfactorily established, or whether it was more probable that the location as claimed for it by the plaintiffs was near its true location rather than that claimed for it by the defendants. If I were to pass judgment as to which was most probably the true location, I would think, or rather guess, that the location claimed by the plaintiffs was more likely its true location than that claimed by the defendants. But it was a simple question of fact to be determined by the jury, and the wonder is that on such evidence they could agree on a verdict for either party. They found for the defendants, thus finding that their claim of the location of this Skile survey was correct. Had they found the plaintiffs' location correct, then the whole Skile survey would lie outside of the land claimed by the plaintiffs as assigned them in this chancery suit. Of course, on well settled principles, in such a case as this, the verdict of the jury cannot be properly set aside, nor could it have been set aside had it been a verdict for the plaintiffs.

The only remaining question is : Were the jury misled to the injury of the plaintiffs by the giving or refusing of instructions by the court? The first four instructions asked by the plaintiff were granted. They amounted, in substance, to instructing the jury that the burden of proving the true location of the Skile survey was on the defendants; and that if they believed from the evidence that true locations had not been established, or that it was just as probable that the Skile survey did not interlap with the lands assigned the plaintiffs in the chancery suit, they should find for the plaintiffs. The fifth instruction asked by the plaintiffs was that, from the proceedings in this chancery suit, the defendants were estopped from claiming any portion of the land assigned the plaintiffs in that suit, even if any portion of it was covered by the Skile survey. This instruction was refused by the court, and, from what we have said, the court properly refused it. The other instructions asked by the plaintiffs were :

"(6) If the jury find from the evidence that the poplar that formerly stood at the point designated (12) on the Sinnett map, and mentioned in his report of survey filed in this suit, was a corner of Jacob Skile's survey of 420 acres of land claimed by the defendants, and that if, by locating the said 420 acres of land, with said poplar as a point in said survey, none of the said 420 acres will be within the boundary of the lands described in the declaration of the plaintiffs, then in that event they do find for the plaintiffs.

" (7) If the jury find from the evidence that if, by locating the said 420 acres near the William Price lands, as called for in said 420 acre survey, none of the said 420 acres will be within the boundary of the lands described in the declaration of the plaintiffs, then in that event they do find for the plaintiffs."

Two other instructions, Nos. 8 and 9, were asked by the plaintiffs, and refused by the court. They were also instructions, in effect, that the defendants were by the proceedings in this chancery suit estopped from claiming any land assigned to the plaintiffs in this chancery suit. From what has already been said, the court did not err in refusing them.

The court did not err in refusing instruction No. 6 above stated. This instruction is very loosely drawn, but, construing it most liberally, and as it was probably meant by the plaintiffs' counsel, it does not propound correct law. Though the jury was satisfied that the poplar at fig. 12 was the fourth corner in this Skile survey, yet, if they were equally well satisfied that point 6 on the map, the chesnut tree on the ridge, lying a considerable distance inside of the land assigned to the plaintiffs in the chancery suit, and to recover which this suit was brought, was the seventh corner of the Skile survey, they could not find a verdict for the plaintiffs for all the lands they claimed, as this instructed them to do; for though, by corners and distances of the Skile survey located from this poplar at 12, none of the Skile survey would lie on the land claimed by the plaintiffs, yet, if this chestnut oak on a ridge was proven to the satisfaction of the jury to be the seventh corner of this Skile survey, the courses and distances of the Skile survey could not be followed as laid down in the patent, but they would have to be so varied as

to make both this poplar at 12, and this chestnut tree on a ridge at 6, the fourth and seventh corners of the Skile survey, correctly located; in which case, as all of the Skile survey could not lie outside of the boundary of the land claimed in the declaration, the jury could not have found a verdict for the plaintiffs for all the land they claimed. It is true it might be a very difficult matter to satisfy any jury that this poplar, fig. 12, was the fourth corner of the Skile survey, and at the same time fig. 6, the chestnut oak, was the seventh corner, yet the jury might have reached this conclusion. This sixth instruction really excluded from the consideration of the jury the evidence offered by the defendants as to the location of this Skile survey, which the court very properly refused to do.

The seventh instruction was also liable to the same objection. If the jury had believed that the defendants had established three of the corners of the Skile survey as located at points 5, 6 and 19 on the map, then they were bound to find that the Skile survey overlapped the lands claimed by the plaintiffs, though in so doing no part of the Skile survey would be nearer to Price's land than 30 poles; for this indefinite description call near " William Price's land " would have to yield to the definite locative calls, such as " the chestnut tree on a ridge," the seventh corner of this Skile survey. There is no doubt that this description call, " near Price's land," was entitled to much weight in determining if the proof was doubtful, whether this chestnut tree, the seventh corner, was ever really located at fig. 6. Still, it was for the jury to consider and determine whether it was or not; and if they found that it really was there, they could not find for the defendants all the lands which they claimed, though in doing so they had to regard the Skile survey as near William Price's land.

The defendants asked seven instructions to the jury, all of which were given, and the plaintiffs excepted to the giving of each of them. They are :

(1.) If the jury find that John J. Dickinson, on the 18th day of October, 1858, received from the clerk of the County Court of Kanawha county a tax-deed embracing in the boundaries the lands in controversy, and that in the year 1860 he,

by his tenant, Page Stanley, entered upon the lands embraced in his deed, and had the continuous, exclusive, and adversary possession of any part of said boundary, by building, cultivation and occupancy, for a period of ten years, in the absence of proof of any possession of the plaintiffs, or those under whom they claim, of any portion of the land in controversy, or of the Steele 27,000 acre tract, during said ten years, then, at the end of ten years after the commencement of said adversary possession, the title of said John J. Dickinson and those claiming under him ripened into a perfect title for all the lands embraced in the tax-deed, including the land in controversy.

(2.) If the jury find that the defendants have succeeded in locating the true position of the corners of the Jacob Skile survey of 420 acres, located on the map at fig. 14, and the corner located at the point 5, and the chestnut corner at fig. 6, then it is competent for the jury to locate said survey by reversing the calls of the survey from the point fig. 6, the chestnut; thence to 5, running thence by course and distance to fig. 19, and thence by a straight line to the chestnut at fig. 6.

(3.) The court instructs the jury that the recital and description in the Price entry can not contradict or control the local calls in the Skile grant.

(4.) In locating the Jacob Skile grant, the point called for in the same, beginning at a large black oak on a ridge near the head of Carrol's branch, must, in the absence of the other controlling evidence, be sought for or located on the ridge near the head of the main or longest fork of said branch.

(5.) The court instructs the jury that any call or description in the Skile entry which conflicts with the calls or description in the Skile grant must be ignored and disregarded.

(6.) In locating a survey made as far back as the year 1790 it is not necessary that all or any of the corner trees should be proved to be still standing, or be accounted for; the survey can be successfully established by the local descriptions contained in the grant, if it be so given as to separate the land described in the grant from the adjacent territory.

(7.) The description in the Skile grant, "near the land. of Wm. Price," is descriptive, and, if it conflicts with any of the location calls in the Skile grant, it must yield to such locative calls.

The first of these instructions was based on certain evidence which I do not deem it necessary to state. As the plaintiffs could not recover any land in this suit of the defendants except upon the strength of their own title, and if any portion of the land of the plaintiffs claimed was recovered by the older and superior title of those claiming under the Skile survey of 420 acres, the defendants in this suit, whether they had held any possession of it or not, it seems to me, whether they proved such possession or not, the plaintiffs, having proved no possession of the land they claimed, could not recover. The instruction might have been made more accurate in language if, at the end of it, there had been added the words, "if covered by the boundaries of the land in controversy when it is properly located." But the jury must have understood this instruction, as the whole case, and especially the four instructions granted to the plaintiffs, shows that there was no claim set up that the plaintiffs were not entitled to a verdict for all the lands they claimed, unless the defendants could show that some portion of it was covered by the Skile survey, the same named in this tax-deed.

There is no good objection to instruction No. 2. "The figure 14" named in it should have been "the figure 19," as the map and evidence clearly shows. This mistake in writing down a number correctly could not, obviously, have misled the jury with the map before them. The instruction differs widely from plaintiff's instruction No. 6, in this : that it simply says that "it is competent for the jury to locate the survey in a specified manner," but it did not require the jury to so locate the survey if, in addition to the facts stated in this instruction, they believe that the fourth corner of the survey was satisfactorily proven to be the poplar fig. 12 ; for it could not then have been at 3 on the map, which it would have been if the jury had located the survey as this instruction said only that it was competent for them to do. This would have been proper if they did not believe the

fourth corner was at 12, where the plaintiffs claimed it to be ; but if they believed this additional fact, they, in locating the survey, would have had to run from 4 to 12, instead of 4 to 3, and run the other lines as stated in this instruction, except that the course running to the supposed known corner fig. 19 would have been changed from the calls of the survey, as well as the distances ; but as all changes would have been made in lines outside of the land claimed by the plaintiffs, it would in no manner have affected the land in controversy,—the interlap between the plaintiffs' land and the Skile survey. There does not seem to me to be any sound objection to this instruction. It did not require the jury to locate this survey as specified in this instruction ; it only told the jury what they might do if they believed certain facts, without fairly implying that they could not do otherwise, if they found another fact to be proven. In this important respect it differed from plaintiffs' instruction No. 6, which was rejected.

William Price's entry referred to in defendants' instruction No. 3, was thus worded: "William Price, Jr., enters 1,000 acres of land to join an entry of 500 acres made by Jacob Skile on the N. E. and E. side." This could not, as this instruction says, "contradict and control the local call in the Skile grant." It might be evidence of considerable weight with a jury in determining whether the local calls in the Skile grant were correctly fixed by the defendants, seeing it removed the Skile grant 230 poles from the nearest point in Price's grant. This instruction No. 3 was unobjectionable.

Instructions Nos. 4, 5 and 6 of the defendants appear entirely unobjectionable; and as to instruction No. 7 of the defendants I have already expresssed views, when discussing plaintiffs' instruction No. 7, which necessarily lead to the conclusion that the defendants' instruction No. 7 was proper for the very reasons which rendered the plaintiffs' instruction No. 7 erroneous. There were, then, no instructions given or refused by the court of which the plaintiffs can complain.

It is claimed by the counsel for the defendants in error in this Court, though no such point was raised in the court

below, that there are fatal defects in the tracing of the title of the plaintiffs to the land named in the declaration. I deem it unnecessary to examine this point, as we have seen that, without reference to it, and admitting they properly traced title to the Steele patent, still the court below did not err in the instructions it granted or refused, nor did it err in refusing to set aside the verdict of the jury in favor of the defendants, and in entering up a judgment on the verdict of the jury that the plaintiffs take nothing, and the defendants go hence without day, and the defendants recover of the plaintiffs their costs.

This Court a year ago decided this case, but during the term of the Court at which our judgment was rendered it was set aside and a re-hearing awarded. The case has been again argued at this term, and, for reasons I have stated, this judgment of the Circuit Court of Kanawha county, rendered on April 12, 1884, must be affirmed, and the plaintiffs in error must pay the defendants in error their costs in this Court expended, and $30 damages.

AFFIRMED.