# CHARLESTON.

CECIL et al. v. CLARK et al.

HALL et al. v. SAME.

(DENT, JUDGE, *dissenting*).

Submitted March 25, 1898—Decided April 9, 1898.

1. PARTITION—*Equity Jurisdiction—Co-Tenancy—Statute of Limitations.*

   The fact that one tenant in common has been ousted by another in sole possession, claiming the whole under conveyance from another co-tenant, will not debar a court of equity from jurisdiction in partition, so long as the right of entry is not barred by the statute of limitations. They are still co-tenants for the purpose of partition, under section 1, chapter 79, Code 1891. In such suit the court may pass on the adverse right claimed by the co-tenant. (p. 663).

| 44 | 659 |
| 45 | 401 |
| 45 | 402 |
| 44 | 659 |
| 47 | 390 |
| s47 | 403 |
| 47 | 625 |
| 44 | 659 |
| 48 | 319 |
| f48 | 461 |
| 48 | 462 |
| 44 | 659 |
| s47 | 402 |
| s49 | 460 |
| 44 | 659 |
| 56 | 571 |
| e56 | 573 |
| 56 | 577 |
| 56 | 580 |
| 44 | 659 |
| 58 | 100 |
| 58 | 101 |
| 44 | 659 |
| 61 | 460 |
| 44 | 659 |
| 59 | 674 |
| 44 | 659 |
| e62 | 90 |
| 62 | 482 |
| 63 | 585 |
| 44 | 659 |
| f64 | 601 |
| 65 | 123 |

2.  EQUITY JURISDICTION—*Jury Trial—Constitutional Law.*

    In matters of such nature as give right to a jury trial under the constitution, the legislature cannot extend equity jurisdiction over them, and deprive the party of jury trial against his will. (p. 666).

3.  EQUITY JURISDICTION—*Jury Trial—Constitutional Law.*

    Where already, at the time of the adoption of the constitution, equity exercised jurisdiction in certain matters, the clause of the constitution guarantying jury trial does not relate to such matters or deprive equity of jurisdiction therein to act without a jury. (p. 667).

4.  CO-TENANCY—*Purchase of Tax Title—Forfeiture for Taxes.*

    A tax purchase by one tenant in common of the land owned in common is but a redemption, and inures to the benefit of co-tenants. So with a purchase under a sale of land under the common title forfeited for taxes, and sold by commissioner of school lands. (p. 682-3).

5.  CO-TENANCY—*Adverse Title—Purchase by Co-Tenant.*

    Is it necessary, to enable one tenant in common to share in the benefit of an adverse title or incumbrance purchased by a co-tenant, that the two tenants have acquired their right by separate instruments? (p. 683).

6.  CO-TENANCY—*Ouster of Co-Tenant—Purchase of Adverse Title.*

    Can a tenant in common, who has ousted his co-tenant, and claims adversely, buy to his sole benefit an adverse incumbrance or title? (p. 683-4).

7.  CO-TENANCY—*Purchase of Adverse Title—Laches of Co-Tenant.*

    As a general rule, a tenant in common cannot purchase to his exclusive benefit an outstanding adverse incumbrance or title to the common property; but his co-tenant, to participate in its benefit, must, within a reasonable time, make his election to claim its benefit and contribute to the expense of its purchase. If he unreasonably delays until there is a change in the condition of the property, or in the circumstances of the parties, he will be held to have abandoned all benefit arising from the new acquisition. (p. 682, 685).

8.  CO-TENANCY—*Purchase of Adverse Title—Knowledge of Purchase.*

    In such case, before the co-tenant can be held to have abandoned the benefit of the purchase, it must appear not only that he knew of the purchase, but of an adverse claim to its exclusive benefit, set up by his co-tenant. He may reasonably presume the acquisition was made to support, not to defeat, the common title. (p. 683).

9.  EQUITY JURISDICTION.

    Where, upon one ground, a court of equity has jurisdiction, it

will give complete relief, even in matters as to which, considered alone, it would not have jurisdiction.   (p. 670).

10. FORFEITURE FOR TAXES—*Redemption—Collateral Attack.*

Where a proceeding is instituted by a commissioner of school lands in a circuit court of a county to sell land forfeited for non-entry in that county, and there is a redemption under it, and the land declared exonerated from forfeiture, and it turns out that no part of the land is in that county, yet the State cannot, in a collateral proceeding, deny the validity of the proceeding or the redemption for want of jurisdiction in the court, nor can strangers nor privies in estate with those who asked and were allowed. (p. 674).

11. FORFEITURE FOR TAXES—*Jurisdiction of Court—Collateral Attack—Presumption.*

A circuit court acting in proceeding by a commissioner of school lands to sell forfeited land under chapter 134, Acts 1872-73, though the proceeding be in nature administrative, not judicial, is yet, so far as its jurisdiction is concerned, to be regarded as a court of general jurisdiction, and in a collateral proceeding no proof of the existence of facts essential to jurisdiction is required, nor can the same be received to disprove their existence. It is presumed that the court ascertained those facts giving it jurisdiction to exist.   (p. 676-7).

12. JURISDICTION OF COURT—*Record—Collateral Attack.*

In the case of an inferior court, if its record does show that facts necessary to give it jurisdiction existed, its jurisdiction will not be open to attack, nor can proof of such facts be demanded, or disproof thereof admitted in a collateral proceeding.   (p. 677).

13. HUSBAND AND WIFE —*Deed—Acknowledgment.*

A deed by husband and wife must have been signed by him when acknowledged by her.   She cannot acknowledge a paper not signed by him.   It must be one deed, nut separate or duplicates, one executed by the husband the other by the wife, though both are to same effect.   (p. 688).

Appeal from Circuit Court, Summers County.

Actions by W. P. Cecil and others and J. R. Hall and others, respectively, against E. W. Clark and others, trustees of Flat Top Coal Land Association. These suits were united, and tried together. From a judgment for plaintiffs, defendants appeal.

*Modified.*

J. S. CLARK, A. W. REYNOLDS, and J. W. HALE, for appellants.

COUCH, FLOURNOY & PRICE, MOLLOHAN & McCLINTIC, D. W. McCLAUGHERTY, DAUTHITT & AYERS, and P. W. STROTHER, for appellees.

BRANNON, PRESIDENT:

By patent, in 1851, Virginia granted to Henley Chapman and David Hall a tract of one thousand, seven hundred and fifty acres of land lying in Mercer and Tazewell counties, "the greater part being in Mercer." Later the patentees conveyed eight hundred and twenty-five acres of it to Perdue, leaving nine hundred and twenty-five acres, but called in these cases eight hundred and fifty acres. The deed recited that the land conveyed to Perdue was all that part of the original survey lying in Mercer; but it gave metes and bounds not certainly telling whether it took all land in Mercer, and the patent said the greater part was in Mercer, and oral evidence shows some of the eight hundred and fifty acres remnant in Mercer. McDowell county was formed wholly from Tazewell in 1858, and took in all of this land that was in Tazewell. Chapman and Hall died, leaving each five children. Hall died in 1866, leaving a widow, Mary E. Hall, and five children. He left a will giving his estate to his wife for life, with power of disposition, and remainder to his children. In 1875, Mary E. Hall conveyed one undivided fourth of the eight hundred and fifty acres to Johnson under contract that, as the tract had been omitted from the tax books of Mercer, Johnson would replace it on the books, and pay back taxes, and keep it on the books. The deed described the land as in Mercer. Thus Johnson became owner of half the Hall half. In December, 1881, all the Hall heirs gave Johnson an option to purchase the other half of the Hall half, and under it they conveyed it to Johnson, 18th December, 1882. By deed of August 2, 1882, Manilius Chapman, one of the five heirs of Henley Chapman, conveyed the whole of the Chapman moiety to Johnson. The Chapman heirs, in 1889, brought a chancery suit against Johnson and others to cancel the deed from Manilius Chapman to Johnson, and certain conveyances under which, from Johnson, the trustees for Flat Top Coal Company, claimed this Chapman

moiety, and asked partition and assignment of their shares.
In 1889 the Hall heirs brought a chancery suit against
Johnson and others to cancel their deed to Johnson for the
half of the Hall moiety, on the ground of fraud in its pro-
curement, and asked partition of the land and the assign-
ment of their shares.   Both sets of heirs attacked a tax
deed made to the coal company as assignee of a tax pur-
chase made by Johnson affecting their entire interest, and
also a conveyance made by the commissioner of school
lands of McDowell county to the coal company under a sale
in a proceeding in the circuit court of that county against
the land in controversy as forfeited.   The cases were
heard together.   The decree admitted four of the Chap-
man heirs to partition under their father's right to the
Chapman moiety, giving the coal company the Manilius
Chapman interest, and refused to cancel the deed from the
Hall heirs to Johnson, finding the charge of fraud not sus-
tained, and that none of them were entitled to have parti-
tion, except Mrs. Torbett, and gave her partition to have
assigned to her one-tenth.   The trustees holding title for
the coal company appeal.   So do the Hall heirs.

The first question is one of jurisdiction in equity.   It is
said there is no jurisdiction on the basis of partition, and
this because the Chapman and Hall heirs have been ousted,
and that the trustees of the coal company are in posses-
sion holding and claiming by title and claim adversely
to the plaintiffs, and that equity has no jurisdiction in par-
tition when the parties hold by adverse title, and that the
plaintiffs must sustain their right at law.   Under the old
common-law writ of partition, and in suits of equity pure-
ly for partition, prior to the statute found in Code 1891, c.
79, s. 1, the court would not pass on conflicting titles; and,
where the rights of the parties were involved in adversary
claims, would grant no partition until the title was settled
by the proper action at law.   Therefore, when a joint ten-
ant, tenant in common, or parcener did such acts as con-
stituted an actual ouster of another, that other could not
maintain a writ of partition or chancery suit for partition,
but must, by writ of right, establish right to an undivided
interest.   Where one conveyed the whole tract to a stranger
and under his conveyance the stranger took possession,

that was an actual ouster of the other co-tenants, and they could not have partition until they recovered at law admission to their undivided interests, and then could have partition. But that statute has wrought some change. This inability to give effective relief in cases of partition because of the presence of a controversy or question as to the title detracted from the efficiency of the remedy in equity in matters of partition, and this act was meant to change the rule theretofore prevailing by enabling the court to try all the questions of title incidental to the partition of land. It was to give power to do just what the court had not till then been able to do,—pass on the title as between the parties interested under the common title. That was the evil to be remedied. Why give the act a circumscribed construction, falling short of removing the impediment which had been so long hampering courts of equity in giving full relief in matters so essential, and so often arising? The able lawyers who framed the Code of 1849 in their report to the legislature referred to the old rule under such cases as *Stuart* v. *Coalter*, 4 Rand. 74, and said the rule should not be continued here, and said, "We propose, therefore, by this section to abolish the restriction." Then, in *Currin* v. *Spraull*, 10 Grat. 145, this restriction under the former rule was especially referred to, and the court held that while, prior to the act, the court could not try title, yet under it the court had authority "to try the question of title." In *Hudson* v. *Putney*, 14 W. Va. 561, it is again held as working this change, and as enabling the court to decide questions of title. In *Moore* v. *Harper*, 27 W. Va. 362, it is held that under this statute, in a suit for partition, a court of equity may take cognizance of all questions of law affecting the legal title that may arise in the proceeding, such as removing a cloud from title, or passing upon an adverse claim to the land. This is broad enough in words to allow a stranger's title to be tried, but it does not mean that; but it surely does mean that an adverse claim to the same title may be passed upon. In the late case of *Pillow* v. *Improvement Co.*, 92 Va. 144, (23 S. E. 32), it is held that under this statute, "if the defendant claims under one who was joint owner with the complainant, or those under whom he claims, the suit may be maintained,

and all questions of law arising in the case may be settled by the court.'' Now, do not the defendants in this suit claim under Manilius Chapman, who was a joint owner with the plaintiffs? If, therefore, one co-tenant oust his brother, equity has jurisdiction to entertain that brother's suit for partition until that ouster has continued to bar the right. If he have right of entry, he may ask partition on its strength.

I also think that if one co-owner, whether in actual possession or not, convey the whole tract to a stranger, who takes actual possession, and thus disseises the others, equity, notwithstanding such ouster or disseisin, has jurisdiction of a suit for partition by the others, until their right is barred by limitation, and the court may pass on all questions necessary to settle the titles or rights of the parties incidental to the consummation of partition. Before the statute it was otherwise. If this is not so, what good does the statute do? What its effect? The able and lamented Judge Holt, in an opinion prepared for this case, speaking of a deed by one co-tenant conveying more than his share, in answer to the contention that it created an adverse claim ousting equity of its jurisdiction, said: ''Has any one ever heard of a court of equity coming to a dead halt in proceeding to set aside a deed obtained by breach of trust in fraud and crime towards plaintiff, and made to a *particeps criminis*, as soon as it is ascertained that such conveyance had resulted in plaintiff's disseisin; or that plaintiff is therefore no longer co-tenant, because disseised, and therefore not within the letter or spirit of the act? Cannot a court of equity set aside the deed, and restore his seisin, and remit him to his rightful title?'' If this be not so, then a co-tenant plainly so to-day, and subject in a court of equity to partition, may assume in the morning to convey the whole, and, presto, his brother is no longer a co-tenant, cannot have partition in equity, but must sue his brother's vendee at law, because he holds an adverse title. Especially should we so construe our statute when like statutes are so construed elsewhere, and the old limits are transgressed of late even without statute. In Freem. Co-Ten. § 450, it is said ''the limitations in partition proceedings are constantly weakening, and the

tendency to do full and complete justice in one action is becoming irresistible, and that, wherever the question has recently arisen as a new question, the answer to which the courts were free to give without consulting decisions made at an early day when common-law rules were more potent than at present, it has been resolved in favor of taking jurisdiction whenever the complainant shows himself seised of the requisite title, whether the lands are held adversely to him or not." If he has right of entry,—that is, right to possession,—that is enough. The act of his brother in ousting him himself, or by conveying to another, does not control his remedy. See *Howey* v. *Goings*, 54 Am. Dec. 427; *Weston* v. *Stoddard*, (N. Y. App.) 33 N. E. 62. But we have a statute to warrant us in thus extending the jurisdiction; and why shall I say more to vindicate this application or construction of it when cases commencing forty years since so construe it, as shown above? It is said the statute gives partition only between co-tenants, and an adverse holder is not a co-tenant. The statute changes that. Under it the adverse claimant is a tenant in common with the others, being a privy in estate with one who has a common title and seisin in law or fact with the plaintiff. To hold otherwise, we will have to reverse many cases in which this Court has, in partition, held that adverse claims may be passed on. *Deem* v. *Phillips*, 5 W. Va. 168; *Arnold* v. *Arnold*, 11 W. Va. 449; *Boggess* v. *Meredith*, 16 W. Va. 1, and cases above. I think this construction of our statute is fully sustained by point 5 of the syllabus in *Davis* v. *Settle*, 43 W. Va. 17, (26 S. E. 557). My construction of the statute does not allow stranger titles to be adjudged in partition, nor even all adverse claims, though originating in a common title, but only adverse claims derived from one who was a co-owner with the plaintiff. I gave my views as to this in a dissenting opinion in *Davis* v. *Settle*, 43 W. Va. 17, (26 S. E. 557); *Carberry* v. *Railroad Co.*, 44 W. Va. 260, (28 S. E. 694), also discusses this subject, but in that an adverse title arose from an actual sale for forfeiture.

But it is said this construction makes the statute void, because contrary to the provision of the Constitution that the right of trial by jury in suits at common law, if required by

either party, shall be preserved. This does not apply to
suits in equity on matters of equitable jurisdiction. The
clause was intended to preserve a jury trial, if asked, in all
cases; that is, in all matters of such nature as would support
a demand for a jury by the law in force at the time of the
adoption of the constitution. It was not designed to ex-
tend the right to new matters of a nature not then sup-
porting a demand for a jury. Cooley, Const. Lim. 504.
The legislature cannot enact that a matter giving the right
to have a jury under the law at the adoption of the consti-
tution may be tried without a jury, or give jurisdiction of
it to a court of equity or other courts not using a jury,
unless there be some equitable ground of relief. *Haines'*
*Appeal*, 73 Pa. St. 169 (opinion); *Barlow* v. *Daniels*, 25 W.
Va. 515. When there is a ground of equity jurisdiction,
as fraud or other grounds, then chancery can try without
jury any matter, though it be of legal nature, and such as
would call for it if it stood alone, and not incidental to relief
in a suit properly in equity. Trial of adverse claims to
freehold calls for a jury trial, and therefore it is plain that
no legislation can, after the adoption of a constitution
giving such jury right, vest in chancery, for trial without
jury, the decision of adverse claim to the land, if, at its
adoption, the law gave that right; but if at that date it does
not call for a jury trial, it is different. As the guaranty
does not extend the jury to subjects not calling for it at
the date of the constitution's adoption, it follows that if, at
that date, a court of equity, under the then existing law,
exercised jurisdiction upon a given matter, its continued
exercise of jurisdiction does not infringe upon the right
under the constitution. Cooley, Const. Lim. 504; Sedg.
St. Const. 486, 488; full note to *Steamboat Co.* v. *Roberts*,
48 Am. Dec. 186, 188. When the Virginia constitution of
1851 and our two constitutions of 1863 and 1872 were
adopted, the statute in question was a part of the Code,
and under the principles just stated it would seem plain
that this power to try adverse claims to land in a partition
suit would be consistent with the constitution. It is,
however, said that this cannot be so, and that the position
to that effect stated by me in my dissent in *Davis* v. *Settle*,
*supra*, and the holding to the same effect in *Pillow* v. *Im-*

*provement Co.*, 92 Va. 144, (23 S. E. 32), are untenable, for the reason that when that statute was passed it was contrary to the constitution, and void, and no law when those new constitutions were adopted. This seems to be plausible at first view, but, when we reflect, it cannot be so regarded. My position in answer to that theory is that this law was on the statute book when all those constitutions were adopted, and had not been adjudged unconstitutional, and had been recognized as valid law in *Currin* v. *Spraull*, 10 Grat. 145; *Cosgray* v. *Core*, 2 W. Va. 353, and *Hudson* v. *Putney*, 14 W. Va. 561,—in cases arising prior to our present Constitution, and its authors must be taken to have made it with their minds upon that statute as a part of our then existing law. A statute in Illinois, providing that in chancery suits for partition the court may investigate and determine all questions of conflicting or controverted titles, and remove clouds, was held not contrary to the jury clause of the constitution, though passed after its adoption, because it was a chancery suit. *Flaherty* v. *McCormick*, 113 Ill. 538. So I think Cecil and other Chapman heirs can, under the head of partition, maintain their suit.

The Hall heirs, how as to them? Clearly, there is jurisdiction under the head of partition for the Hall heirs, because the defendants are clearly co-tenants with them, if their deed to Johnson be set aside as they prayed. Mrs. Hall conveyed one-fourth to Johnson. He was then cotenant. Later the Hall heirs made a deed to him purporting to convey him all their interests on its face, saying they were heirs of David Hall. Remove that deed, and he and his vendees would be co-tenants, owning that half in common with other heirs. That deed makes Mrs. Torbett and her husband parties, declares she has a fifth, and, it being void as to her for want of her husband joining in it, she is a co-tenant, so declared on the face of the deed under which Johnson and the trustees claim, and they are bound under the familiar rule to notice all rights declared by their title papers; and when the trustees took actual possession they took it as co-tenants with her in the eye of the law. They did not take under a deed for the whole; thus they are co-tenants with her in the same common

title. Could she not sue them for partition? She had a
lawful fifth, the trustees a lawful four-fifth interest. If it
had been her separate estate, their entry might be an ous-
ter. This land vested in her, and she was married before
the separate estate provision in chapter 66, Code 1868.
She and her husband had joint seisin. It was not sepa-
rate estate. By an ouster with adverse possession ten
years their joint right of entry would be barred. *Caper-
ton* v. *Gregory*, 11 Grat. 505. And she could not recover
during coveture, but could after it ceased, she or her
heirs, under the saving clause in the statute of limitations.
*Merritt* v. *Hughes*, 36 W. Va. 356, (15 S. E. 56). But we
must remember that her husband made papers conferring
on Johnson such estate as he had,—right to posession at
least during coverture; and they had seisin in fact,
during his life, and when the coal company took possession
in 1887, they did not oust Mrs. Torbett, but entered as
owners of the life estate, and under it with knowledge
imparted by the deed from the heirs that she was entitled
to the fee in remainder, and we must attribute that entry
to the life estate, and the coal company's possession as her
possession, not adverse, as the possession of a life tenant
is not adverse to the remainder-man. *Id.* I do not see
how we can say there is any ouster as to Mrs. Torbett.
Surely entry and actual possession under said instruments
would not *per se* be an ouster. If it could at all take place
during the life of the husband, it would have to be by act-
ual notice of adverse hostile claim brought home to her
(*Cooey* v. *Porter*, 22 W. Va. 120); but, as they claim under
the sole deed of Torbett, how could they do this until his
death? If there was an ouster as to her, there is no color
to say she cannot sue for partition, so far as the question
of equity jurisdiction is concerned. I say, however, that,
even if there were no ouster as to her, her right of entry
would give her standing in equity for partition. In addi-
tion to the ground of partition for equity jurisdiction, both
the Hall and Chapman heirs have jurisdiction under the
head of fraud, as the Hall heirs charged that the deed
from them to Johnson was procured by fraud, and asked
its cancellation; and there being jurisdiction on that
ground, equity will grant partition as incident, even be-

fore the statute above discussed though there had been disseisin and hostile possession. Freem. Co-Ten. § 449; *Nichols* v. *Nichols*, 67 Am. Dec. 707. It cannot be said that there is no jurisdiction in equity on the score of fraud, simply because, in the end, when the defense is heard, and on the evidence, the court decides that fraud is not proven. It is the bill or declaration that tests this, not the defense. In *U. S.* v. *Arredondo*, 6 Pet. 709, the court said that, if the bill states such a case as that on demurrer the court would give a decree, it is an undoubted case of jurisdiction. Wells, Jur. 2. The facts alleged give jurisdiction for fraud, and we cannot deny this as justifying jurisdiction, unless those facts are stated colorably or fraudulently to get jurisdiction as shown by other parts of the bill. *Thompson* v. *Iron Co.*, 41 W. Va. 574, (23 S. E. 795,) citing *Laidley* v. *Laidley*, 25 W. Va. 525, and other authorities. The bill does not show this. The Chapman heirs likely have jurisdiction to cancel the deed from Manilius Chapman to Johnson for the entirety. I will add as to both sets of heirs that they have unquestionable jurisdiction in equity to cancel the tax deed, as equity will cancel such a deed, regardless of the fact that defendant is in possession under it, though relief could be had at law, this being an exception to the rule that no jurisdiction is in equity to remove cloud where defendant is in possession. *Simpson* v. *Edmiston*, 23 W. Va. 675; *Clayton* v. *Barr*, 34 W. Va. 290, (12 S. E. 704); *Christian* v. *Vance*, 41 W. Va. 754, (24 S. E. 596). Equity, having jurisdiction for one purpose, will go on to give relief. *Bettman* v. *Harness* 42 W. Va. 433, (26 S. E. 271); Freem. Co-Ten. § 449. Can we question that where one co-tenant has taken a void tax deed, another may cancel in it equity, and, having done so have partition from the one so mistreating him? The deed from Manilius Chapman to Johnson for the whole moiety left Johnson only a co-tenant. So Johnson's vendees. The other heirs had a right to sue in equity to annul this deed. That is an additional ground of jurisdiction. And as one of the appellants' counsel concedes, and as is true, all have jurisdiction in equity to have the redemption in McDowell circuit court declared not a purchase, but a redemption, and to declare the deed from the commissioner of school lands

to the company as vesting title for common benefit. Where equity has jurisdiction for one purpose, it gives complete relief. So I think jurisdiction in equity is clear.

Now, as to the merits of this controversy, we start with the undeniable proposition that when Henry Chapman and David Hall died, under their joint patent from the state of Virginia this land descended to their heirs, one half to the Chapman heirs, and the other half to the Hall heirs. Have these heirs lost their rights? If they have not, they are entitled to partition. How have they lost their rights? Let us take the Chapman heirs separately. It is said that they transferred their rights to Manilius Chapman, one of the heirs. It is said that he, as administrator of his father, overpaid assets in his hands and thereby became a creditor of the estate, and that his brothers and sisters agreed that he should take this land in discharge of that indebtedness. This proposition is proven by no one but one Peck, who stated that Manilius Chapman consulted him about his indebtedness against the estate, and about enforcing it against this land, and he said that Manilius "claimed that there was some kind of an agreement or understanding between the rest of the heirs and himself that he (Manilius Chapman) was to have his father's interests in the land in payment of what he claimed would be the indebtedness of the estate to him." Now, but for the fact that this evidence was introduced by the plaintiff, it would not be admissible, being a self-serving statement of Manilius Chapman to sustain his claim. That only makes it competent. Its weight is another matter. At best it is weak and inconclusive evidence: And look at its character. It is so indefinite and vague. If we say that it with sufficient certainty related to this land, and that the terms of the contract are fixed, yet who are the parties to it? All or only part of these heirs? When and where did this one make such agreement? What were the exact condition of that agreement? We do not know. Ought there not be proven or shown a definite contract by each of these heirs, such as would bind him in law? Instead of that, we have the indefinite language that there was "some kind of an agreement or understanding." A court of equity would not execute that. And then some were married

women, incapable of making such an oral contract in the face of the statute requiring a writing acknowledged in conjunction with the husband. Manilius admitted to Peck that he had no writing. And then there never was any possession taken under such oral contract. We cannot ascribe to this contract possession taken by the coal company years later, when we know that then Chapman had conveyed to Johnson, and Hall heirs had conveyed, and the company took possession under those deeds, not under or in execution of this alleged contract. Possession under it alone is necessary to make it good. *Gallagher* v. *Gallagher*, 31 W. Va. 9, (5 S. E. 297). It was utterly incapable of enforcement in a court of equity, and therefore it cannot operate as an estoppel against the plaintiffs; and some of the heirs were dead, most likely at the time. Taking the contract at its best, it is too weak to warrant us in saying that by it, if any contract ever existed, these Chapman heirs deprived themselves of their rights. But Manilius Chapman's conduct repels the idea that he had such a contract on the facts; in short, that he proceeded to enforce his indebtedness against the interest of one of his brothers in this very land; and in a statement of his accounts as such administrator he gave no credit at all, or account of this land as a payment to him of the estate's indebtedness to him, and he offset against a debt due from him upon a bond to one of his sisters her share of the estate's indebtedness to him, and thus collected it. For these and other reasons, which could be elaborated, but are mere matters of fact, not proper to be here detailed, we are compelled to say that this claim of Manilius Chapman to the interests of the other heirs is utterly untenable. He never took any steps whatever to enforce this right; he never claimed its execution during his lifetime.

It is said that these heirs lost the title by forfeiture for nonentry for taxes. If so, it was redeemed from that forfeiture. In March, 1882, in the circuit court of Mercer county, in a proceeding by the commissioner of school lands for the sale of this land, Manilius Chapman and the heirs of Hall filed their petition, setting forth the joint grant of it to Henley Chapman and David Hall as the foundation of their title to the land, and that the land had been

for years charged in the name of Mary E. Hall, a child of
David Hall, and that Manilius Chapman had, by arrange-
ment with the heirs of Henley Chapman, become owner of
half of the land, and that all taxes had been paid upon it
except for 1878; and the petitioners claimed the right of
redemption, and the court decreed that the petitioners had
the right to redeem, and that they had paid all the taxes
thereon, and chargeable thereon, for all years except the
year 1878, and ascertained the amount of taxes necessary
to be paid to redeem the land, which was paid into court,
and the land was exonerated in the following words: "And
it is ordered tha said tract of land be, and is hereby, re-
leased and exon rated from all former taxes and forfeit-
ures." Now, u .der Acts 1872–73, p. 455, this operated to
relieve the land rom forfeiture, because that act declares
"that such order shall operate as a release of all former
taxes on said and, and no sale thereof shall be made."
*Hall* v. *Swann,* 39 W. Va. 353, (19 S. E. 509); *Taylor* v.
*Burdett,* 11 Leigh, 33 . However, I do not think the tract
was forfeited, since, by the quantity given in the patent,
the remnant of the tract was less than one thousand acres,
and could not be forfeited for omission for reasons stated
in *Industrial Co.* v. *Schultz,* 43 W. Va. 470, (27 S. E. 255).
But it is said that the circuit court of Mercer had no juris-
diction, because the land lay in McDowell county, and
none of it in Mercer. Now, plainly, the burden is on
those who would nullify this act of the court to show the
fact denying the jurisdiction, but it is not shown. The
patent covering a larger amount than the land now in
controversy, it being a part of the larger amount, recited
the land as lying in Tazewell and Mercer counties, the
greater part of it in Mercer. Oral evidence in this case
showed that this particular remnant of it was in Mercer.
The State had assessed it in Mercer, and in 1879 purchased
it at a tax sale for taxes of 1878, and its auditor reported it
as school land in Mercer. The school commissioner of
that county filed his petition representing that it lay in
Mercer. Manilius Chapman, under whom adverse claim
to the other heirs is made, represented in his petition for
redemption that it lay in Mercer. The court must be
taken to have ascertained to its satisfaction that fact as a

jurisdictional fact, and thus determined it had jurisdiction. The suit, it is true, was not technically a suit between the State and the owners; but we can certainly say this much: that the State chose that court as one of proper jurisdiction, and that it obtained there the relief to which it was entitled, and received the taxes adjudged to be due to it, just the same as if it had been in McDowell county; and it is not here questioning the validity of that proceeding because of want of jurisdiction. If it were so doing, it would be estopped from thus injuring those who, as innocent parties, accepted its choice of a court and recognized its jurisdiction, and paid the State its demands pursuant to the order of its own chosen court. But, as I said, the State is not questioning it. Can others deny the fact of redemption when the State is not denying it, and could not deny it? It is only those who claim under Manilius Chapman who are denying it, and Manilius Chapman himself treated that court as having jurisdiction by filing his petition for redemption in it. *Martin* v. *Barbour*, 140 U. S. 634, (11 Sup. Ct. 944); opinion in *Miller* v. *Lohr*, 12 Grat. 456; *Witham* v. *Sayre*, 9 W. Va. 678; *Bradley* v. *Ewarts*, 18 W. Va. 609. No matter that this was not a suit, but an administrative proceeding, yet I say that the State is bound by it as an estoppel, and so all others are denied the power to nullify the proceeding by the allegation of nonjurisdiction. Notwithstanding it is not a suit *inter partes*, yet as to the parties really before it, especially the State, it must be taken that its jurisdiction is not open to collateral attack by third parties, but is conclusive as to jurisdiction.

This feature of the case introduces an interesting and important question, on which it may be proper to say more on authority. Is the State bound by estoppel? In a general sense, perhaps not; but frequently it is. Here the State chose the circuit court of Mercer as the forum for her proceeding. Now, strangers, not the State, in a collateral proceeding come in and say the whole transaction in that court is void because the court had no jurisdiction, when she could not herself deny it. In *Clark* v. *Barnard*, 108 U. S. 436, (2 Sup. Ct. 878,) the point was raised that the state of Rhode Island was the real party, and could not be sued. The state had appeared, and filed a petition

claiming the fund, and the court held that the voluntary appearance of the state conferred jurisdiction to adjudicate its rights, and that it became an actor as well as a defendant by intervening, and this gave jurisdiction. Here the state selected this court as plaintiff. The United States government is bound by judicial proceedings instituted by it. *The Siren,* 7 Wall. 152; *Carr* v. *U. S.,* 98 U. S. 433. The state cannot say her proceeding disposing of state property was without jurisdiction. *Cunningham* v. *Shanklin,* 60 Cal. 118; Bigelow, Estop. 341. Herm. Estop. 219 says: "A state is bound by her judicial pleadings and admissions, the same as private persons, and is entitled to no greater right or immunity as a litigant than they are. The doctrine of estoppel applies to the state just as it does to individuals. Nor is this rule varied by the fact that there are others interested in the subject-matter of the proceedings conducted by the state. * * * So where the state, by its proper officers, enters into an agreed case, if it is not bound by the agreement, it is, in any event, concluded by a judgment and decision to which it has not excepted." In the same book (page 1264) we read: "In the absence of fraud or collusion, acts of public officers in behalf of the state, within the limits of their authority, and in performance of duties, in dealing with third persons, are the acts of the state, and cannot be repudiated by it." Throop. Pub. Off. p. 551. See *Com.* v. *Johnson,* 33 Grat. 294. It may be of public use to insert the following quotation from the opinion in the case of *People* v. *Stephens,* 71 N. Y. 527: "It may be suggested that the doctrine of of *respondeat superior* does not apply to the state, and it may be conceded that the state is not responsible for the negligence or misfeasance of its servants in cases where, within the ordinary rules of law, a master would be responsible for the acts of a servant. But when power is necessarily devolved upon a public officer to perform acts for the state, and third persons deal with such officer relying upon his authority and the validity of his acts, there is no reason or principle why the doctrine, '*Qui facit per alium facit per se,*' should not apply to the extent of binding the state for contracts and payments made by the officer in the discharge of the duties of his office, and within

the limits of his authority, and to the same extent that a principal would be bound by the acts of an agent under the same circumstances. It would not be permissible for a comptroller or auditor of the canal department, or other auditing officer, to review the actions of his predecessor in the auditing and payment of claims, because he might think that a settlement as advantageous as might or ought to have been made had not in fact been made. Parties dealing with state officers may regard their action as a finality, and it would tend to serious consequences if every completed transaction of public officers might be submitted to a jury of twelve men in an action at law brought at any time within six years after its consummation. There would be no safety in dealing with the state if such was the law, and the public would have to pay dearly in all contracts and settlements with individuals for this privilege of reviewing the action of their servants and agents. Story, Ag. § 307a; *People* v. *Jansen*, 7 Johns. 332; *Hayden* v. *Auburn State Prison*, 1 Sandf. Ch. 195; *Supervisors* v. *Briggs*, 2 Denio, 26; *Martin* v. *Supervisors*, 29 N. Y. 645; *Chase* v. *Saratoga Co.*, 33 Barb. 603; *Supervisors* v. *Birdsall*, 4 Wend. 453; *People* v. *Greene*, 56 N. Y. 466; *People* v. *Thayer*, 63 N. Y. 348; *U. S.* v. *Kirkpatrick*, 9 Wheat. 720. To the extent that some of the cases have held that the government is liable for mere laches or neglect of a a public officer, they may not be authority, but there seems to be no dissent from the proposition that by acts of public officers within the scope of their powers the public is bound." In addition to all this, the provision in section 19, chapter 105, Code 1891 (Acts 1891, c. 94), that when in any proceeding theretofore for the sale of forfeited land the former owner has been permitted to redeem by payment of the amount fixed by the court, "such payment shall be valid and binding on the state, regardless of the irregularity of the proceeding or of any want of jurisdiction in the court to render such decree; and whatever right, title, or interest the state may have had in such lands shall, by virtue of such decree and payment, be transferred to and revested in such former owner." Without this act, the proceeding, on common-law principles, was efficacious to remove only forfeiture; but here is a legislative validation

of it, and the act is itself a legislative grant to the former owner. The circuit court of Mercer is treated in argument as if, in this matter, it were an inferior court, bound to prove the fact giving it jurisdiction. This is a mistake, I think. True, it is, that under the then existing law the proceeding was administrative merely, not a suit between parties. No person had a right to become a party, and it was not void for want of them, under *McClure* v. *Maitland*, 24 W. Va. 561. But does that make it an inferior court, bound to establish by proof, dehors its record, that the land in fact lay in Mercer, whenever its action is involved in a collateral proceeding? I say not. Its procedure in the matter was judicial; its steps are to be so regarded. It is none the less a court of general jurisdiction as to its procedure because the general nature of its function in the case was administrative because of the matter on which it acted. Notwithstanding the character of the subject-matter before it, the court had to ascertain whether the fact giving jurisdiction existed; and, being a court of general jurisdiction, if it is not stated on its record that such fact exists, it would be presumed that it had been established to its satisfaction. But I find the order does state it, and the principle then comes in that, "when the record of an inferior court (even if it were such) does show affirmatively the jurisdictional fact, it is conclusive." 1 Black, Judgm. 287; 12 Am. & Eng. Enc. Law, 274; Bigelow, Estop. 66; *Shank* v. *Town of Ravenswood*, 43 W. Va 242, (27 S. E. 223). Where the jurisdiction of even an inferior court is dependent on a fact which the court is required to ascertain and settle by its decision, such decision is held conclusive; and, furthermore, it has been claimed that this principle is not confined to determinations of a judicial character. *Evansville, I. & C. Straight-Line R. Co.* v. *City of Evansville*, 15 Ind. 421, 423. Courts do not favor a forfeiture, and will require full proof of facts to sustain it. *Townshend* v. *Shaffer*, 30 W. Va. 176, (3 S. E. 586).

The point is made by counsel that only the taxes of 1878 were paid in such redemption, and the taxes of prior years were not in fact paid; but the petition of the school commissioner alleged that such taxes were paid. So did the

petition of Manilius Chapman and the Hall heirs for redemption. Could Manilius Chapman or his subsequent privies in estate deny the fact? The court found such to be the fact, and so decreed. That decree operated as a redemption, and left the title in *statu quo*, vested in the heirs of Chapman and Hall, as it had been before the forfeiture. It is said this redemption did not inure to the benefit of all the Chapman heirs. For another reason, it cannot be that the redemption did not go to the benefit of all in law entitled, and that is that Johnson received a conveyance from Mrs. Hall of an interest in the land to pay back taxes on the whole tract, not an interest in it, and his act was a redemption of the whole tract. He cannot say it was only for the Manilius Chapman or other limited interest, nor can his vendees. The petition for redemption was in the names of Manilius Chapman and the Hall heirs; but if he had not, in fact, the exclusive right to the shares of his brothers, children of Chapman, but only his own share, in the eye of the law is it not plain that this act of salvation of the title would go for the common use of all? His petition averred that his brothers had once title, and only averred that he had acquired their right from them. Suppose he had not acquired it. His redemption would be for all. This redemption was under claim of the Chapman and Hall joint patent, and, once made, operated for all then entitled, as between themselves, to the land.

This case is argued as if it were clear that no part of the land lies in Mercer. The patent said it was there. If so, some of it remains in Mercer. Other circumstances and proof show it is there, and the defendants have shown nothing adequate to show that it is not. But suppose we treat this redemption as void for want of jurisdiction. The title would be, it is true, vested in the State by forfeiture; but, if these parties are co-tenants of the land, as I have sought to show above, that does not deny them right to partition of their claim to the land, be it good or bad, because I apprehend that, if parties are co-tenants, or common owners of land under a colorable title, though not the best title, yet one of them, when sued for partition, cannot come in and say that there is better outstanding title; for the court, while it will investigate the rights of the parties

to come into the partition, yet it will not inquire whether that title under which partition is asked is valid or not, as contrasted with some other title. Especially is this so when they yet had right of redemption from the State,—a right to reinvest themselves with title vested in the State. Surely, forfeiture of joint estate does not bar its partition when this right of redemption exists. When the title of the State is subject to defeasance by redemption, cannot brothers who have made a deed of trust have partition? The State by forfeiture acquires a fee defeasible on condition subsequent,—that is, redemption,—and before redemption there may be partition between the former owners.

In the year 1885, in a proceeding in the circuit court of McDowell county for the sale of a large quantity of what was claimed to be waste and unappropriated land, such proceedings were had that a certain quantity of land claimed and owned by persons whose titles were protected by the constitution and laws from sale was declared exempt from sale, as reported by the commissioner to whom the sale had been referred, and the court declared that there were within the boundary certain tracts belonging to persons whose titles were protected, among them the land in controversy. Now, this was a proceeding under the act of 1882 relating to the sale of lands for the benefit of the school fund, and has been decided by this Court to be a chancery suit. *Hays* v. *Camden's Heirs*, 38 W. Va. 109, (18 S. E. 461); *Wiant* v. *Hays*, 38 W. Va. 681, (18 S. E. 807). This was a valid declaration against the State that this land was not then forfeited, but was protected from sale under the Constitution and laws of this State. It is *res adjudicata* against the State upon the question of its nonforfeiture. The fact of nonforfeiture, as against the State, was settled, Shall others say that it was forfeited in such a proceeding as this? So we must say that the taint of forfeiture once existing has been thoroughly removed and purged away.

In May, 1885, in the circuit court of McDowell county, the commissioner of school lands filed a petition and report stating and showing the forfeiture and vesting in the State for nonentry on the tax books of McDowell county of the land in controversy in this case, therein represented as

then owned by the Flat Top Coal Company; and that company filed its petition praying to be permitted to redeem and purchase said land, and exhibiting its title to it, and it was adjudged that the Flat Top Coal Company had title to the land superior to any other claimant, and entitled to redeem and purchase the same, and that company paid twenty-two dollars and eighty-five cents in full of all taxes due upon said land. This proceeding was based upon the theory that the land lay in McDowell county, and had never been entered therein for taxes, and was, therefore, forfeited; and the court, by its order, declared the land· released from all forfeiture and former taxes, and that the commissioner of school lands should make to the said company a deed releasing all the State's right, title, and interest therein on account of said forfeiture. None of the Halls or Chapmans were parties to this proceeding, and had no notice thereof. What is the effect of this proceeding? Did it devest the Hall and Chapman heirs of their right? By no means. And why? Because they were not parties to that proceeding, and had no notice thereof. It could not, therefore, establish the fact of forfeiture against them. *Chevallie* v. *Twiggs*, 4 W. Va. 463. This proceeding was under chapter 95, Acts 1882, which has been decided in *Hays* v. *Camden's Heirs*, 38 W. Va. 109, (18 S. E. 461), and *Wiant* v. *Hays*, 38 W. Va. 681, (18 S. E. 807), to be a regular chancery suit, and therefore persons not parties to it could not be bound by its proceeding; but at that time there was no law in force authorizing any sale to the former owner. The Flat Top Coal Company, claiming derivatively through D. E. Johnso . this land under the Chapman and Hall title, was a party s . nply entitled to redeem, and not to purchase. The orde  is one purely of redemption, for it declares that they ha'1 valid title to the land, and were entitled to redeem; and, moreover, chapter 46, Acts 1885, authorizing a former owner to purchase, had not then gone into force. So this was simply a redemption. The deed of the commissioner under that decree did not pass title to the coal company, but was only a redemption, and left the title as it was before. No matter who makes a redemption under a particular title, whether party to the title or stranger, it is a redemption. When

the party from whom the redemption is to be made, state or tax purchaser, receives the money necessary to effect a redemption, the state or tax purchaser is bound, notwithstanding the party redeeming may be one not authorized to redeem. Cooley, Tax'n, 366, 382, 383; *Martin* v. *Snowder*, 18 Grat. 100. The forfeiture in the one case and the purchase under the tax sale in the other is at an end, and the title reverts to those from whom it was forfeited or sold. And, besides, the land was not forfeited, as the redemption in Mercer relieved it of forfeiture, if it had been forfeited; and the McDowell proceeding could not pass title from the owners, as such a proceeding does not pass title if the land was not forfeited. *Twiggs* v. *Chevallie*, 4 W. Va. 463. Much more so now than at the date of that case, for under the act of 1882 the owners must be parties.

After the redemption above spoken of in the circuit court of Mercer, the land was entered for taxes of 1882 in McDowell county on the theory that it had been discoverd to lie in that county, and was returned delinquent, and sold for taxes, and purchased by D. E. Johnson, who assigned his purchase to the Flat Top Coal Company, which took a deed therefor under the tax sale. What is the effect of that deed? For reasons not necessary to specify, that deed was void in law. It can confer no title upon the Flat Top Coal Company; cannot pass from the Chapman and Hall heirs their title as yet remaining in them. But there is another reason applicable to that tax deed, and applicable also to the deed just above mentioned from the commissioner of school lands of McDowell to the Flat Top Coal Company under said redemption proceeding in McDowell which forbids either from being operative to destroy the title of the Chapman and Hall heirs. Johnson had a contract prior to this tax sale and redemption proceeding with Manilius Chapman for the conveyance to him of an undivided moiety in this land, and it was conveyed to him by Manilius Chapman by deed in August, 1882, and he had an option from the heirs of Hall prior to that for the sale to him of their interest in said tract, and he had a deed for half the Hall moiety from Mary E. Hall prior to such tax purchase, and later the Flat Top Coal Company derived from Johnson as the owner of both moieties in the

land in the entire tract. Johnson was thus a co-tenant with all the Chapman heirs except Manilius, and with Mrs. Torbett, a Hall heir, as to whom the deed from the Chapman heirs was void by reason of her coverture. His purchase was but a redemption. It inured to the benefit of all who were interested in the relation of co-tenants and vendors just stated. The purchase of a tax title or other title by a co-tenant inures to the benefit of all. *Gilchrist* v. *Beswick*, 33 W. Va. 168, (10 S. E. 371); *Battin* v. *Woods*, 27 W. Va. 58, 70; *Bowers* v. *Dickinson*, 30 W. Va. 716 (6 S. E. 335). As Judge Staple said in *Forrer* v. *Forrer's Ex'rs.* 29 Grat. 144: "This rule is based on the community of interest in a common title, creating such a relation of trust and confidence between the parties that would be inequitable to permit one of them to do anything to the prejudice of the others in reference to the common property. This principle equally applies to joint tenants, tenants in common, co-parceners, and all others having a common title and interest." And as the coal company derived title from Johnson, and stood in his shoes, it occupies no different place from him. It took the tax-title assignment then as he had it. That coal company was in law co-tenant with the plaintiffs in these cases as to the rights justly belonging to them, and the same line of remark applies to said coal company as regards its redemption in the circuit court of McDowell county in the year 1885, above spoken of. That redemption inured to the benefit of the Chapman and Hall heirs who had not by their act passed their title. But it is said this doctrine by which such tax purchase and redemption is made to inure to the benefit of the Chapman and Hall heirs cannot properly apply because Johnson and the coal company claimed adversely to them, and that it only applies where the parties claim under the same instrument; that is, to co-parceners or grantees in the same conveyances, but not between one co-parcener and the grantee of another co-parcener. This would say that the grantee of one tenant in common is not a tenant in common or co-tenant with persons who were co-tenant with his grantor. Freem. Co-Ten. § 86 says that tenants in common have but one unity, that of possession. So unity of title is not necessary to constitute persons tenants in

common. If there be unity of possession or unity of right of possession, that is sufficient. 4 Kent. Comm. 367, says: "Tenants in common are persons who hold by unity of possession. They may hold by separate and distinct titles, or by title derived at the same time by the same deed or descent." "Persons owning undivided interests in realty are tenants in common, though their titles were acquired by separate conveyances, and at different times." *Stevens* v. *Reynolds* (Ind. Sup.) 41 N. E. 931. Thus it is the law that persons deriving title from one co-tenant will be regarded as tenants in common with the other co-tenant. *Dain* v. *Cowing*, 39 Am. Dec. 585. Therefore I say that when one person, who in law is a cotenant, purchases another title to the land, he purchases for the benefit of all. He may claim that he is sole owner, but if, in fact, the law will hold him to be not sole owner, but a tenant in common with others, that purchase is for the common benefit of all. The test is does the law adjudge him to be a tenant in common? Otherwise one merely claiming unwarrantedly to be sole owner, whereas he is in law only a coowner, could purchase an outstanding title, and wipe out the interest of the others. In this case it is the purchase of one and the same title by those who in law are tenants in common, though they set up claim to the entirety under claims derived from others.

There are cases holding that, to enable one tenant in common to have the sole benefit of an adverse incumbrance or title bought in by him, he and his co-tenants must derive title under one and the same instrument or act of the parties or law. and that where tenants in common derive title under different instruments, one may buy in, and hold to his exclusive benefit such adverse claim or incumbrance. This is on the theory that when under the same instrument they are as joint tenants, and a mutual trust and confidence exists; but under different instruments of acquisition this cannot be said. 1 Lomax, Dig. 262; *Roberts* v. *Thorn*, 25 Tex. 736; *Rippetoe* v. *Dwyer*, 49 Tex. 505. In note to *Keech* v. *Sandford*, 1 White & T. Lead. Cas. Eq. 74, it is said: "But tenants in common probably are subject to this particular obligation only where their interest accrues under the same instrument,

or act of the parties or of the law, or where they have entered into some engagement or understanding with one another; for persons acquiring unconnected interests in the same subject by distinct purchases, though it may be under the same title, are probably not bound to greater protection of one another's interests than would be required between strangers." See full note, *Venable* v. *Beauchamp*. 28 Am. Dec. 83, criticising this position, saying the only authority cited in White & Tudor's Leading Cases for it is *Matthews* v. *Bliss*, 22 Pick, 48, and that it supports no such proposition; and, in my opinion, it does not. The case of *Elston* v. *Piggott*, 94 Ind. 14, supports it. *Brittin* v. *Handy*, 73 Am. Dec. 497, leans towards it. *King* v. *Rowan* 10 Heisk, 675, so holds. *Wright* v. *Sperry*, 21 Wis. 331, and *Sands* v. *Davis*, 40 Mich. 14, favor it. As an original proposition, I would consider it correct. I cannot see why tenants in common, deriving in separate ways, or where one has ousted another and brought home to him notice of adverse claim, or made actual entry under a deed claiming the whole, and thus become the enemy of the cotenant, and negatived all relation of trust and confidence, may not buy in an outstanding lien or title and take its benefit. The strength of this position will likely ultimately enforce it. But the general rule that one tenant in common, joint tenant or co-parcener cannot do so has been so long stated in a general way, that I cannot say that this exception is tenable. In *Rothwell* v. *Dewees*, 2 Black, 613, the rule is stated generally, without such exception, and it is laid down that it is because of their community of interest in the same subject, creating a relation of trust and confidence, that tenants in common cannot purchase and take exclusively to themselves adverse title. In *Bracken* v. *Cooper*, 80 Ill. 221, this exception is denied, and it is said the rule is based on community of interest, not on the accidental circumstance that they derive title under the same instrument. *Stevens* v. *Reynolds* (Ind. Sup.) 41 N. E. 931, is decisive on the point. "Persons owning undivided interests in real property are tenants in common, though their titles were acquired by separate conveyances and at different times." This matter has no pertinency to the redemptions in the circuit court of Mercer and McDowell,

as they were merely redemptions, not purchases, and it is only important as to the tax purchase; but under principles above stated it inured to the common benefit of the co-tenants who still had interests. Besides, that tax deed was void. Johnson, at the date of the sale, had deeds purporting to convey the whole, but no actual possession was taken under them till later. If actual ouster was necessary to enable him to acquire adverse title, it did not exist. The mere taking a deed for the whole from co-tenants or others, not following by entry, is no ouster. Freem. Co-Ten. § 226; *Buchanan* v. *King's Heirs* 22 Grat. 414, syl. 8. In this connection it is pertinent to say that a tenant in common, to get the benefit of the purchase by another of an adverse claim, must offer, in a reasonable time to pay his share of the outlay. He cannot let one spend money, and never repay him. But to effect him with delay it must appear, not only that he knew of the purchase, but also that he knew of adverse claim under it. *Buchanan* v. *King's Heirs*, 22 Grat. 414. These plaintiffs lived in a distant state. There is no evidence they knew of this tax purchase; no possession or claim under it longer than two years before suit. Besides all said above, this was not the purchase of a stranger title, but of the common title of all. It was a purchase for taxes, and it was the equal duty of all to pay taxes on the common estate. And so it is peculiarly the case with a tax purchase that it is only a redemption. *Battin* v. *Woods* 27 W. Va. 58; *Curtis* v. *Borland*, 35 W. Va. 124, (12 S. E. 1113); *Williamson* v. *Russell*, 18 W. Va. 613; Freem. Co-Ten. § 158; *Venable* v. *Beauchamp*, 28 Am. Dec. 85; Rice, Mod. L. Real Prop. 918.

These considerations repel all idea that the four other Chapman heirs passed by their act to Manilius Chapman their interest in the land so as to warrant his conveyance of the entire moiety to Johnson; and they repel all idea that the four Chapman heirs or the Hall heirs are devested of their interest by reason of forfeiture or the sale for taxes. So it is clear to me to conclude as to the four Chapmen heirs other than Manilius that they are entitled to their interests. The conveyance by Manilius was an ouster, but that was in August, 1882, and no possession

was taken under it until 1887, and that by the coal company. Treating it as an actual ouster, unless accompanied by possession, it could not operate as such. It would take ten years of actual possession after the act constituting ouster to mature their right. This suit was brought in 1889. So those four heirs must have partition giving them their interest, as the circuit court held.

The Hall interest: David Hall's will gave these lands to Mary E. Hall for life, with remainder to his five children. Mary E. Hall made a deed to Johnson for one-half of the Hall moiety. The bill in this case treats the will as valid. Johnson therefore became entitled to that fourth. All the heirs of Hall, including the married women and their husbands, made an executory contract for the sale of the one-half of the Hall moiety to Johnson. This contract was in the shape of an option, and it was executed by conveyance, on the 18th day of December, 1882, for all said heirs, to Johnson, of one-fourth of the whole tract. There might be question, therefore, whether Johnson had any more than an estate for the life of Mary E. Hall in onefourth of the tract, but the will of David Hall gave his wife power of disposition. She conveyed one-fourth to Johnson in consideration that he enter the entire tract on the tax books and pay certain back taxes; and the said deed from the heirs recites that Mary E. Hall had conveyed a onefourth interest to Johnson, and thereby recognized and ratified it as a conveyance of the fee; and under these considerations I think we must say that Johnson, by that deed from Mary E. Hall, acquired a one undivided fourth in fee. Thus these conveyances would give him the entire Hall moiety except the interest of Mrs. Torbett, who did not join in the conveyance, as I shall presently show. The Hall heirs assail these conveyances to Johnson on charges of fraud and misrepresentation, and a vast amount of evidence and multitudinous circumstances bear upon that question, certainly not necessary to be detailed here, as they elucidate no principle of law, and it would be simply a detail of evidence. Under the well-known rule that fraud must be clearly shown to overthrow conveyances, I come to the conclusion that this attack is not sustained, and, moreover, after being advised of most—of certainly some—

of the material facts on which they predicate the charge of
fraud, if not of all of them, these Hall heirs did not repudi-
ate the said option, although they for a time demurred to
executing it, and did not at last refuse to go further under
it, but, on the contrary, executed a deed carrying it into
execution, and thereby waived all objection to it based on
the allegation of fraud.   By that act they closed the door
upon themselves.   *Hutton* v. *Dewing*, 42 W. Va. 691, (26
S. E. 197).   And, moreover, laches would repel this charge.
After a knowledge for nearly seven years of the most
material facts entering into their pretension of fraud,
which called upon them for diligent and energetic steps to
annul their contract and deed by suit, they bring suit.
He who seeks to annul a conveyance for fraud must not
sleep.   His steps must be prompt and diligent and earnest.
*Whittaker* v. *Improvement Co.*, 34 W. Va. 217, (12 S. E.
507); *Hammond* v. *Hopkins*, 143 U. S. 224, (12 Sup. Ct.
418).   We are the more inclined to this finding because
the defendant, the coal company, has opened coal mines,
and expended large amounts of money upon the premises,
and had commenced these improvements a good while be-
fore this suit was brought, though they had notice of the
plaintiff's claim, and they cannot be placed in *statu quo*.   A
further consideration, weighty with an appellate court, is
that upon a vast amount of evidence the circuit court has
reached this conclusion in this matter of charge of fraud,
and under well-known principles we would not disturb its
finding, unless it was clearly wrong.   But, moreover, if we
were able to say that the charge of fraud as against John-
son was sustained, yet the case is weaker yet to charge
those purchasing from Johnson by conveyances under
which the coal company hold.   But there is one of the Hall
heirs to be excepted out of the conveyance to Johnson,—
Mrs. Torbett.   She signed the option, but it was not
acknowledged by her.   She signed and acknowledged the
deed to Johnson, but her husband did not join therein, and
it is therefore void as to her.   It is said, however, that she
has passed her right to Johnson by reason of the fact that
her husband executed what is termed in this case a
counterpart deed.   It is said that, taking both of these
instruments together, they make a good deed from hus-

band and wife.  After the delivery of the deed to Johnson, to cure the defect in it for want of the signature of the husband, another deed of exactly the same import, but of different date, was sent to her husband, to be executed by him and his wife.  They both signed it, but only the husband acknowledged it.  In that condition it was sent to Johnson.  He sent it back to have Mrs. Torbett acknowledge it.  She never did, and it was not further delivered. It is said that it is not necessary that the husband and wife join in the very same instrument, but that one may properly execute the one and the other execute the other, and that they both evince actual consent of both husband and wife.  There is some plausibility in this argument. They seem both to make one and the same factum or deed, one and the same act, working one and the same result, the conveyance of the land.  But it cannot be truly said that in law they do work one and the same result, for the instrument not executed by the wife is utterly null, and it does not work the result to pass her interest, nor does the deed of the husband result to pass her interest.  The law intends that the self-same instrument shall be executed by both, a joint act, working a joint and common effect in law.  Chapter 149, Acts 1882, says that "when a husband and wife have signed a writing" she shall appear before a certain officer, and acknowledge the same; thus requiring that when she goes before that officer both must have signed that identical instrument which she acknowledges.  The certificate makes the officer say that the married woman (naming her), wife of the husband (naming him), "whose names are signed to the writing above," thus again requiring that when that paper is presented to the officer both names shall be thereon.  It must be a deed as to the husband before the wife can execute it by acknowledgment.  The presence of his name is a precedent condition or prerequisite to its execution by her, for so the statute in words provides.  She cannot convey without the husband's assent.  It is prudent, in the eye of the law, that she have his advice and concurrence, that he should have already given his consent by his signature.  It is not contemplated that she may execute a separate instrument to-day, and that it shall then be sent to the husband, to be by

him thereafter executed, even the same identical instrument. Her act ought to receive his assent by his signature before she makes it. So says the statute. She can convey not otherwise than as the statute allows, for she derives her sole and only power to convey from the statute. The deed without her acknowledgment is a cipher, and we have seen that acknowledgment cannot be made until he has signed it at least. So Mrs. Torbett must be regarded as yet owning her interest, but it cannot be given to her now. And why? Because her estate in this land vested in her prior to the separate estate act. They were married before that, and he became entitled as a husband to possession during her life, and he is yet living. We cannot say that he ever became entitled to curtesy, because there was not seisin in fact by her, and it requires seisin in fact to give curtesy. *Fulton* v. *Johnson*, 24 W. Va. 95. Thus he has an estate and right to possession as long as the coverture continues, and until it ends she is not entitled to possession, and therefore cannot have partition. *Merrett* v. *Hughes*, 36 W. Va. 356, (15 S. E. 56). If he had not made that duplicate deed and optional contract, he and she could have demanded partition; but they passed an estate good during the coverture of Johnson, and until that estate ends those claiming under Johnson have a right to the possession of her interest. It is true that it is argued in this case that that counterpart deed of the husband never was delivered; but it was. Torbett sent it to Johnson. It was, therefore, a perfect delivery as to him. Johnson never returned the deed, so far as regards any estate of the husband which he could pass to him. He only returned it to have the wife join therein for that limited special purpose, and it is a perfect deed as to Torbett, who consented to pass such estate as he had; and, if this were not so, then there is his option constituting an executory contract, and it, as well as the deed, are sufficient memoranda to constitute basis for the specific execution of them against Torbett. *Barrett* v. *McAllister*, 33 W. Va. 738, (11 S. E. 220); *Parrill* v. *McKinley*, 9 Grat. 1.

It is said that a certain Pickett grant for a large tract of land, older than the Chapman and Hall grant, covers the land in controversy, and that therefore, better title is out-

standing, precluding relief to the plaintiff in this case. This only shows outstanding title in a third party, likely the State by forfeiture, and likely it enured to the benefit of the title under which partition is claimed; at any rate it could not defeat a partition, since, as stated above, co-tenants have, as between themselves, right to partition of their common estate, though it be not perfectly clear that it is the best title in the world, as compared with some other possible title. How shall we say that the Pickett title is still subsisting and can or will be enforced against this title.

Since writing the above I have reconsidered the Hall will, and other judges think it conferred a fee on Mrs. Hall, and thus the children took from her, not from the father, and as she died since April, 1869, Mrs. Torbett took a separate estate, and her husband can have no estate *ex jure mariti*, or by curtesy until her death, and passed nothing by his deed. It is a doubtful question with me, as she had power of disposal and control during life, and may have taken a fee under principles adverted to in *Wilmoth* v. *Wilmoth*, 34 W. Va. 426, and I shall not insist upon the view above expressed that she had only a life estate and the children a vested remainder at the father's death, but concede her right to partition and actual possession under it at once   These principles affirm the decree.

I do not think improvements can be charged to the Chapman heirs, because notice was given of their claims, nor to Mrs. Torbett, because her title was disclosed on the face of the title in option and the deed of the Hall heirs to Johnson.

Dent, Judge, (*dissenting*):

Two separate suits in chancery were instituted in the circuit court of McDowell county by W. P. Cecil *et al.* and J. R. Hall *et al.*, respectively, against E. W. Clark *et al.*, trustees, relating to the same tract of land as the subject matter of controversy. In the first suit the plaintiffs filed their bill, supplemental and amended and supplemental bills, and bill of revivor, to all which bills defendants demurred, and filed their answers denying relief, to which plaintiffs replied generally. Depositions were taken by

the parties, and on a final hearing the circuit court granted the relief prayed, and defendants appeal.

The faets in the case are as follows: The commonwealth of Virginia granted to George Pickett a tract of four thousand acres of land in 1795. Afterwards, by patent bearing date July 1, 1851, the commonwealth of Virginia granted t ) Henley Chapman and David Hall "a certain tract or parcel of land containing 1,750 acres, lying in the counties of Mercer and Tazewell, the greater part being in Mercer county," being a portion of the land covered by the first patent. By deed dated April 5, 1856, said Chapman and Hall conveyed to D. R. Perdue a portion of the tract lying in Mercer county, estimated to contain nine hundred and twenty-five acres, leaving vested in said grantors eight hundred and twenty-five acres, afterwards thought to be eight hundred and fifty acres, and in reality exceeding one thousand acres, nearly all of which was found, after the formation of McDowell county in 1858, to lie therein. Henley Chapman died in 1864, and his moiety of said land by reason of intestacy decended to his five children, Manilius Chapman, A. A. Chapman, Araminta D. French, Elvina Pendleton, and Isabella Cecil. The land was assessed on the land books of Mercer county from 1857 to 1866, inclusive, in the names of Chapman and Hall. In 1867 it was assessed on said books to Henley, Chapman, and Mary E. Hall. In 1868 it was dropped from the assessors' books, and was not restored thereto until 1875, when David E. Johnson, the defendant, had it replaced thereon in the name of Mary E. Hall and others. And it was continued in the name of Mary E. Hall until the year 1880 (except for the year 1878) when it was assessed, three-fourths, being 637.80, to Mary E. Hall, and one-fourth, 212.20 acres, to David E. Johnson. For the year 1881 it was so charged. In the year 1878 it was omitted from the land books, was sold as delinquent and bought in by the State, but was redeemed by Johnson the 11th of March, 1882, in the name of D. Hall's heirs and Manilius Chapman. In 1882, Johnson had said land dropped from the land books of Mercer county, and charged on the land books of McDowell county in the name of Hall and Chapman as to three-fourths and said Johnson as to the one-

fourth. The three-fourths was returned delinquent for the non-payment of taxes, and in December 1883, it was sold for taxes, and purchased by Johnson. After that year the lands were assessed to, and the taxes thereon paid by, the present owners and their grantors. At May term, 1885, in a proceeding instituted for the sale of school lands by the school commissioner, this land was treated as forfeited in the county of McDowell, and redeemed by the Flat Top Coal Company as the true owner thereof. On the 2d day of August, 1882, Manilius Chapman, claiming to own the whole of the Chapman moiety in his own right, in compliance with a contract made the 28th of December, 1881, executed a special warranty deed conveying such moiety to said Johnson. The land up until this time had never been in the actual possession of any one. And the Chapman heirs, apparently having abandoned the same, had not been charged with or paid the taxes thereon since 1868, even including Manilius. Nor have the plaintiffs or those under whom they claim ever had possession of, or been assessed with or paid taxes thereon, from the date of Henley Chapman's death, in 1864, even down until this suit was instituted; although Mrs. Cecil was so situated up until the hour of her death, under the Constitution and laws of this State, that she could have redeemed her interest in said land from forfeiture, unless she had abandoned the same to her brother Manilius. She being a married woman, her right expired with her. Const. Art. XIII, s. 6; Acts 1872-3, c. 117, s. 39; Code, c. 31, s. 39. And she and the other plaintiffs might have redeemed the same at any time under the provisions of chapter 96, Acts 1872-73. But they made no effort to do so during the lifetime of Manilius Chapman nor since his death. After the conveyance of Manilius Chapman to David E. Johnson, the Chapman moiety was passed along by various conveyances until it finally lodged in Edward W. Clark, Sidney F. Tyler, and Henderson M. Bell, trustees of the Flat Top Land Trust, who now claim the same as purchasers for value without notice, and are in the actual possession and control thereof, and have been since at least two years prior to the institution of this suit. Plaintiffs insist on four grounds of equity jurisdiction to maintain their bills: (1)

The right to be relieved from forfeiture for non-payment of taxes; (2) the alleged fraudulent conduct of the various defendants in relation to the Chapman moiety of land; (3) the right to have defendant's deeds canceled as clouds on the title; (4) the right of partition.

As to the first, it is only necessary to say that a court of chancery has no general jurisdiction over forfeited lands, but only such limited jurisdiction as is conferred on it by chapter 105 of the Code. It therefore has no authority to direct a school commissioner, or any one else, to institute proceedings for the sale of lands to enable former owners thereof to redeem the same. When the title of land is once vested in the State by forfeiture, such title can only be divested in the manner provided in the Constitution and the acts of the legislature. And the right of redemption is a mere gratuity conferred by the State on the former owner, and can only be exercised in the manner provided by law. *McClure* v. *Maitland*, 24 W. Va. 561. Nor are there any equitable grounds of fraud alleged in the bills. The defendants had the right to enter into the combinations alleged for the purpose of buying or selling lands. They also had the right to redeem such lands as they claimed to own from forfeiture, or buy them in at tax sales, or to take any legitimate steps to perfect such titles as they may have acquired. They have been guilty of no fraud, actual or constructive, towards the plaintiffs. If their tax title and redemption proceedings are void, they in no way interfere with plaintiffs' legal rights. If they are valid, plaintiffs are not entitled to the benefit of them, as their title, if lost, is owing to the laches of themselves and those under whom they claim. Nor are the plaintiffs in condition to ask for the cancellation of defendants' deeds as clouds on their title.

Plaintiffs set up and rely on legal title. They are out of possession, and without legal title. The defendants are in adverse possession under a *bona fide* claim of title. The law is now well settled that a person claiming legal title to land, and not in possession thereof, cannot maintain a suit to cancel deeds of an adverse claimant in possession as clouds on title. *Christian* v. *Vance*, 41 W. Va. 8, (24 S. E. 596); *Carberry* v. *Railroad Co.*, 44 W. Va. 260; (28 S. E.

694); *Clayton* v. *Barr*, 34 W. Va. 290, (12 S. E. 704). Although out of possession, a person holding a good and valid title to land may sue to have avoided a tax deed which owes its existence to the supposed forfeiture or delinquency of such title, or a forged or fraudulent deed purporting to convey such title, as being parasitical growths, or illegal offshoots therefrom, which, if not removed in time, may entirely destroy and supersede the true title. Code, c. 31, s. 27; *DeCamp* v. *Carnahan*, 26 W. Va. 839; *Simpson* v. *Edmiston*, 23 W. Va. 678; *Hoopes* v. *Devaugh*, 43 W. Va. 447, (27 S. E. 251). A mere unexercised right of redemption will not support such suit. The person whose title is legally forfeited must either redeem it before suit instituted, or before the suit is finally heard, and bring it to the attention of the court by an amended bill. *Totten* v. *Nighbert*, 41 W. Va. 800, (24 S. E. 627). A person out of possession cannot maintain a suit to cancel tax or other deeds foreign to his title, and which are the outgrowth of an adverse claim or title, for the reason that his title is not directly affected thereby in such manner as to prevent him from maintaining an action of ejectment against an adverse claimant in possession.

The last and main ground on which plaintiffs rely is the right of partition. The law on this subject is found in section 1, chapter 79, Code, and is as follows, to wit: "Tenants in common, joint tenants and co-parceners shall be compellable to make partition, and the circuit court of the county wherein the estate, or any part thereof, may be, shall have jurisdiction, in cases of partition, and in the exercise of such jurisdiction, may take cognizance of all questions of law affecting the legal title, that may arise in any proceedings." The right to have partition is confined to three classes of persons, to wit, tenants in common, joint tenants, and co-parceners, and no others. The fact that persons claim to occupy such relation towards others will not justify an ejectment suit in chancery to oust such others of their exclusive possession, and cancel their deeds as clouds on plaintiff's title. The relationship must actually exist. Nor will an inchoate right justify such proceedings, but the right must be reduced to actual possession. Plaintiffs' counsel refer to the late case of *Pillow*

v. *Improvement Co.*, 23 S. E. 32, decided by the court of appeals of Virginia, as directly in point. Therein it was held: "That defendants cannot defeat complainants' right to have their legal right settled in a suit for partition by merely denying complainants' right to partition, and holding adversely to them, where defendants' grantor was a co-parcener with complainants." "Where defendants in partition claimed under one who was a co-parcener with plaintiffs, and asserted that said co-parcener subsequently held adversely to the others, the burden of proof is on the defendants to establish some notorious act of ouster or adversary possession brought home to the knowledge of the others." These two propositions, taken together, properly propound the law. But the first, taken by itself, is entirely too broad. It is modified even by the opinion itself, in that it holds that, if the adverse possession had continued for ten years, it would be a complete bar to plaintiffs' suit. The proposition would not have been too broad, but the court added to it in accordance with the facts when such co-parcener at the time of the sale to the defendants was in possession of such property as a co-parcener or joint owner with the plaintiffs. The facts in that case were as follows: Thomas Turner was in actual possession, under a defective title, of a one hundred and twenty acre tract of land. He died intestate, leaving a widow and children, of whom R. D. M. Turner was one, and who was living on, and at the death of his father came into possession of, the land as a co-parcener with the other heirs. After the death of his father, R. D. M. Turner, ascertaining the defect in his father's deed, which, however, was not apparent on its face, and because the meritorious grantor was a minor, he procured for a small sum of money, which was falsely mentioned on its face as a much larger sum, a conveyance to himself. Of this he never notified his co-parceners who were entitled to the benefit thereof. Shortly afterwards he conveyed to Joseph L. Doran, who conveyed to the Southwest Virginia Improvement Company, which in turn conveyed to the trustees of the Flat Top Land Trust. The grantees took the same possession that their original grantor, Turner, had as a co-parcener of his father's heirs. Such being the case,

they took possession under the whole title, and not under their special title from R. D. M. Turner; in other words, as to possession, they were placed in precisely the same position as to the co-parceners as was their grantor, Turner. In the opinion it is said: "As between co-parceners and others claiming in privity, the entry and possession of one is always presumed to be in the maintenance of the right of all, and this presumption will prevail in favor of all until some notorious act of ouster or adversary possession is brought home to the knowledge of the others, or it is clearly shown that he has become owner by purchase." "A clear, positive, and continued disclaimer of title, and the assertion of an adverse right brought home to the knowledge of the other co-parceners, are indispensable, although great lapse of time, with other circumstances, may warrant the presumption of a disseisin or ouster by one co-parcener or other joint owner." And it was held that it required the statutory period of ten years to bar the co-parcener's right to partition, where the adverse claimant entered into the possession of the co-parceny when there is no actual notice of adverse possession, except such as might constructively arise from the possessor having a deed for the whole land from the co-parcener; in other words, the co-parcener could not be deprived of his co-tenancy in the joint possession by the mere execution by the co-parcener in actual possession of a deed for the whole estate to a third person. If such was the law, any co-parcener could defeat a partition suit by making a deed and surrendering the joint possession to some third person. Hence the court establishes the rule that the mere claim of title from a co-parcener who held the joint possession with an entry on the land under such possession will not destroy the tenancy in common, and therefore the right of partition, by merely denying the same and assuming to hold adversely until the co-tenant out of actual possession has by his laches lost his right to bring suit by reason of the statutory bar. This amounts to perfect disseisin. The case under consideration presents a very different state of facts. At the time the deed of Manilius Chapman was made to the defendant Johnson, he or no other person had ever had actual possession of the land.

For over ten years it had been, for some reason not ap-
pearing, abandoned by all the heirs of Henley Chapman,.
even including Manilius Chapman. It must be presumed
that this was because the land was wild, remote, and
sterile, and not worth the payment of taxes thereon.
David E. Johnson, in attempting to save the same from
forfeiture for Mrs. Hall, learns of the original patent to
Hall and Chapman, and also that, while the land was off
the land books a sufficient time to cause its forfeiture, yet
there was no deed of record conveying the Chapman moiety
to any one. He therefore sees Manilius Chapman abo   it,
who claims that he is the true owner thereof, and sells the
same, and makes a special warranty deed therefor to
Johnson. Johnson in turn, along with his other specula-
tions, which appear to be perfectly fair and legitimate,
sells the same with covenants of general waranty to others,
and finally, after passing through several conveyances, it.
becomes the property of the Flat Top Land Trust, an as-
sociation composed of influential and energetic speculators.
Finally a railroad is constructed, probably through the in-
fluence of these speculators, to this land. They take
actual possession thereof, lease the same, open the coal
veins, and begin to market the coal. The land now be-
comes of great value. The plaintiffs, and those under
whom they claim, who, if they have any rights, have been
sleeping on them for upward of twenty years, ever since
the land was dropped from the land books, and, years
after the death of Manilius Chapman, rush in and com-
plain, saying: "It is true that we never before have laid
claim to this land. We have never had the same placed on
the assessors' books, nor paid any taxes thereon, and you
have never heard of us before, but still we are your long-
lost and silent co-tenants, and demand a share in our com-
mon property, which has become so enhanced in value
during our Rip Van Winkle sleep as to make it a matter
worth contending about." Uncle Manilius, who claimed
the land as his own, and sold and conveyed the same as
such, is dead, as are also his brothers and sisters, his co-
heirs, none of whom ever cared sufficient for the land to
pay the taxes due thereon, but permitted the same to be
and remain forfeited during their lives. Are the plaintiffs

co-tenants with the defendants? To be such they must have unity of possession actual or constructive. They had constructive possession unless their title was forfeited to the State up until the present claimants took actual adverse possession thereof under their title from Manilius Chapman. Their entry was not had subservient to the possession of Manilius Chapman, for he never had other than constructive possession apparently long abandoned. The law is well settled that "a conveyance by one co-tenant of the entire estate gives color of title, and, if possession is taken under it, the grantee claiming title to the whole, it amounts to an ouster of the co-tenants, and the possession of the grantee is adverse therein." 1 Am. & Eng. Enc. Law (2d Ed.) 806; Freem. Co-Ten. § 447. This rule is subject to the qualification that, if the conveyance by the tenants is such as to amount to a positive breach of trust and confidence, the co-tenancy having a living, animated existence, such conveyance and the entry thereunder will be held to be in fraud of the co-tenants, and will not amount to a complete disseisin so as to bar their right of partition until the statutory period of ten years has elapsed from the date of the entry; and this for the reason that the deed of the trusted co-tenant is but a fraudulent offshoot from the main title, and forms such a cloud upon it that a court of equity will interfere, and remove it, at the instance of the defrauded co-tenants out of possession, to prevent it ripening into perfect title, to the utter extinction of that from which it at first was but a mere illegal outgrowth. Such rule does not prevail where the co-tenancy is dead and buried beyond resurrection, except by mutual consent of all the co-tenants. Such resurrection would be in the nature of a new life, rather than the regeneration of the old, and would be adverse to any rights secured by third parties during the inanimate period of the co-tenancy. The doctrine of co-tenancy is one of mutual trust and confidence and reciprocal duty. The rule ceases where its reason ceases. A co-tenant not in possession of, and deriving no benefits from, and having no common funds, is not bound to pay the taxes on the common property to prevent its forfeiture, nor to redeem it after it is forfeited. If he does so, it will inure to the

benefit of all if they insist on their rights in a reasonable time; otherwise equity will refuse them its aid. Freem. Co-Ten. § 156. "Tenants in common are not necessarily prohibited from asserting an adverse title. If their interests accrue at different times, and under different instruments, and neither has superior means of information respecting the state of the title, then either, unless he employs his co-tenancy to secure an advantage, may acquire and assert a superior outstanding title, especially where the co-tenants are not in joint possession of the premises." *Id.* § 155. Not only this, but a tenant in common, not under duty to redeem the whole, has the right, with the consent of the state or a purchaser holding the legal title, to redeem his own interest, and allow the residue to remain forfeited. He may also redeem the whole, but he cannot compel his co-tenants to contribute, for they have the right to abandon their interests; and unless within a reasonable time after the redemption, and before the intervention of the rights of innocent third persons, they offer to contribute, equity will deny them its assistance, and refuse to interfere in their behalf. *Watkins* v. *Eaton*, 30 Me. 534. In the present case neither the grantor, Manilius Chapman, nor any of his alleged co-tenants, ever had actual possession, and the grantees taking possession under the deed cannot be possibly held to have entered into possession as the co-tenant of the plaintiffs, nor into their possession, for that they did not have.

Nor is this deed in fraud of plaintiffs' rights, for it is nothing more than a special warranty or quitclaim deed to a tract of wild land long since abandoned by all the Chapman co-tenants, either because it was not considered worth the taxes, or because of some recognized right in Manilius Chapman. He was under no obligation, so far as the record shows, to pay the taxes on or redeem the land for the benefit of the plaintiffs, nor did he ever do so, but purposely allowed the same to be dropped from the land books and forfeited, because of its valueless condition. It was off the land books for the years 1868, 1869, 1870, 1871, 1872, 1873, and 1874, and was thereby forfeited to the State, whether we treat it, as it appears to have been, as a tract of one thousand acres or less; for, if over, it was

forfeited by the Constitution of 1872, and if less, by section 8, chapter 29, Code 1868. This tract is shown to have actually contained upward of one thousand acres, and therefore was forfeited as being within the provisions of the Constitution. If it had been on the books as eight hundred and fifty acres, it could not have been thus forfeited, or if it had been redeemed as a tract of eight hundred and fifty acres this would have satisfied the forfeiture. But, as it was neither on the books nor redeemed, it must be placed in the class to which it actually belongs, to wit, those containing one thousand acres or more; for while it was off the books the owners had no supposition on the subject, and after-suppositions will not relieve from a forfeiture already accrued. But, if such were not the truth, sec. 6, Art. XIII, does not repeal such provision of the law then in existence, which dealt with tracts of land of less than one thousand acres, as there was no provision in such section relating to such lands. The section simply undertook to confirm the law in existence relating to tracts of land containing one thousand acres or more, and place it beyond the power of the legislature to relieve such tracts from forfeiture, and is to this extent a ratification, and a more authoritative declaration of the law, and not a repeal thereof. The fact that tracts of less quantity are not mentioned precludes the idea that the Constitution was intended to deal with them at all, or take from the legislature the power to do so. The State Constitution is a limitation upon, and not a grant of powers to, the legislature, and all legislative powers not withheld from are vested in it. In case of a doubt it must always be resolved in favor of legislative power. Cooley, Const. Lim. 216. It is a matter of impossibility to imply from the constitutional forfeiture of tracts of land of over one thousand acres a prohibition against the forfeiture of a tract containing a less quantity. One was deemed of sufficient importance for constitutional inhibition, while the other, of less importance, was left entirely to legislative discretion. Forfeiture for nonentry on land books and nonpayment of taxes has been denounced as a "drastric, severe, and terrible remedy." But wherefore? There can be no question but the human race holds the surface of the earth in co-

tenancy by Divine appointment. The selfish cupidity and greed of the predominate classes of mankind through ages past, even back to feudal times, ignoring the reciprocal duties and obligations of his great co-tenancy, has built up our present system of land tenures, the theory of which is that all the land belonged originally to the people, and they, through their representing nonentity called the state, have granted it from time to time to the holders thereof. A necessary implied condition attached to all such grants is that the grantees shall contribute their fair proportion to the support of the government for the common weal, otherwise the property should revert to the people to be again granted to some one more faithful to his public obligations. There is nothing "drastic, severe, or terrible" about such forfeiture. · It is simply the people regaining their own by reason of their original co-tenancy rights through failure of their donee to comply with the terms of their donation. To the donee the gratuitous right of redemption is still extended until the title has irrevocably vested in another. Such forfeiture is not only in accord with the fundamental principles of natural justice and the Constitution and laws of the State, but is in no way repugnant to, or in violation of, the constitution of the United States, and especially section 1, Art. XIV, thereof. 25 Am. & Eng. Enc. Law. 405. The Hall and Chapman title was absolutely forfeited to and vested in the State by the year 1874, at the furthest.

The legislature, recognizing the foregoing to be the true construction of the Constitution and tax laws, on the 3d day of April, 1873, passed an enabling act, permitting all owners whose lands were then or should be thereafter forfeited to the State, or any person having a lien or claim thereon, either legal· or equitable, "to redeem the said lands at any time before the sale thereof by paying to the auditor the taxes due the state and interest thereon, and by paying the sheriff of the county in which said lands may lie or have been assessed with taxes, all county, township, district and school taxes due and unpaid thereon;" subject to the usual exceptions in favor of other claimants. Acts 1872-73, c. 96. Afterwards, on the 9th day April, 1873, the legislature amended and reenacted chapter 31 of

the Code of 1868 by chapter 117, Acts 1872-73. So far as tracts of land of less than one thousand acres were concerned, their forfeiture depended on their being omitted from the land books five years after the passage of the act; as to those of one thousand acres or more, the inhibition of the Constitution was recognized and followed. It is not necessary to notice the forfeiture in McDowell county, where the land is now said to lie, as the forfeiture was complete in Mercer county. The placing the land on the land books by David E. Johnson and the assessor in the name of Mary E. Hall, and continuing the same down to the date of the Manilius Chapman deed, did not relieve the same from the forfeiture; for neither the illegal acts of the original owner nor its officers can divest the State of its title to its lands. *Totten* v. *Nighbert*, 41 W. Va. 800, (24 S. E. 627); *Yokum* v. *Fickey*, 37 W. Va. 762, (17 S. E. 318). Nor would the placing of the land on the books, if legal, in the name of Mary E. Hall, inure to the benefit of the Chapman moiety, for the reason that she placed the same thereon under claim to the whole thereof, and her act would be considered either as applying to her interest alone, or rather an act of ouster than otherwise, and, if continued long enough, in conjunction with other acts of ownership, would amount to a complete bar of title, for it was their duty, as the owners thereof, to have the land placed on the books in their own names  The alleged forfeiture in 1878 and purchase by the State did not add to or affect in any manner the title already in the State. The title being thus vested in the State, and having been off the land books for upwards of twelve years, so far as the Chapman moiety was concerned, when Manilius Chapman deeded the whole thereof by special warranty he only abandoned the mere right of redemption, adversely however, to plaintiffs. So far as the co-tenancy was concerned at this time, it was lifeless. It imposed no obligation on Manilius Chapman to redeem the land, and he committed no breach of trust in executing his special warranty deed, for, while it purported to convey the whole, it could only convey such interest as remained in him. Nevertheless, with this deed at this point, unless the whole thereof properly vested in Manilius, the Chapman title branched into two adverse

parts.   Defendants, claiming the whole under such deed, owed no duties or obligations as co-tenants with plaintiffs; and all their acts and proceedings thereafter in attempting to secure a good title were adverse to plaintiffs' title, and cannot inure to their benefit.   It is true that, if plaintiffs had, as they might have done, redeemed the land, and restored their rights therein, as they had no claim to the interest of Manilius Chapman, they might have created a co-tenancy between themselves and the present owners of the land.   But this they did not undertake to do, but, having remained quiescent until they believe that the defendants, by their superior diligence, have redeemed the title from the State, they ask that they may be participants therein.   Though equity will not deprive them of their legal right of redemption, if it still exists, it will not take from the defendants adverse rights acquired by their diligence.

While the order of redemption made on the 11th day of March, 1882, purports to redeem the whole title, and is an apparent satisfaction to the State of all its taxes, but falsely so, yet it will be limited to the redemption only of such title as was vested in the defendants, or rather that they had the legal adverse right to redeem, and will not be held to extend to the adverse claim of plaintiffs.   Such redemption, if valid, operates to release all former taxes and forfeitures, but only in behalf of the title making the redemption, and not in behalf of an outstanding superior adverse title not represented in the proceedings.   Married women and infants are not bound by such redemption, nor are they entitled to be made partakers thereof unless they are privy to the title making the redemption. To a superior adverse claimant of the Henley Chapman title, who has fully redeemed the same in accordance with chapter 96, Acts 1872-73, such latter redemption would be but a mere cloud, subject to equitable removal, but could not inure to the benefit of such superior title forfeited and unredeemed, unless made in its interest, and not adversely. For instance, Mrs. Cecil, being a married woman, if her rights were not abandoned to Manilius Chapman, both by Constitution and statute would have had the right, up until the date of her death, to have redeemed the Henley

Chapman title; and the order of the 11th of March, 1882, would neither have barred her rights, nor inured to her benefit, although, after she had exercised the right of redemption, she would have the right to attack such pretended order of redemption as a cloud upon her title. In the case of *Simpson* v. *Edmiston*, 23 W. Va. 675, it is held that: "Where two or more persons claim the same land under adverse titles or color of titles, if either desires to protect his title from forfeiture he must enter the land on the assessors' book in his name, and pay the taxes thereon. The payment of taxes on such land by an adverse claimant will not protect other titles from forfeiture. Each claimant must enter the land and pay the taxes on it in his own name." The same rule applies to redemptions—that each adverse claimant must make redemption of his particular title in his own name,—as the redemption by one adverse claimant will not inure to the benefit of another. In this case, by reason of the dereliction of its officers, the State never has received its taxes for the years 1868, 1869, 1870, 1871, 1872, 1873, and 1874, and if the plaintiffs had at any time asked to redeem the lands they would have had to pay these taxes. The defendants redeemed the land only for the forfeiture of 1878, which as heretofore shown, was not a forfeiture at all. The State, by permitting such falses redemption to take place, may have bound itself as to any further claim of back taxes as against the defendants, but not as against the plaintiffs. The same reason applies to the reservation in the order of the 4th of October, 1882, made by the county court of McDowell county. The reservation was not in behalf of the general title claimed by plaintiffs, but the special adverse title of the defendants under Manilius Chapman. The tax deed resulted from the mere forfeiture of this special adverse title, and under it Johnson took nothing, but simply redeemed such title, as no entry on the land books, it matters not in whose name, could relieve the original forfeiture which already vested the title in the State, but nothing but a redemption in the manner provided by law could effect such result. *Totten* v. *Nighbert*, above cited.

With regard to the proceedings of the May term, 1885,

the same reasoning fully applies, and with the same force, as is heretofore applied to the redemption order of March, 1882. Such order could not affect a superior, adverse, outstanding title redeemed, but not represented. In all these proceedings on the part of the defendants there has never been a single act that recognized the existence of a co-tenancy between themselves and the plaintiffs; on the contrary, every act on their part was adverse to the plaintiff's pretensions, and under and by virtue of their deed from Manilius Chapman. The Henley Chapman title never has been redeeemed from its original forfeiture, but it still vests in the State, except in so far as the State may have parted with it to or barred itself as against the defendants. The plaintiffs, for upward of twenty years, though having equal opportunities with the defendants, have never tried to redeem it, But, instead of doing so, and thus acquiring their legal rights without any other than a mere disputed equity of redemption, endeavor in this suit to fasten on the defendants the reciprocal obligations of co-tenants. The purchasers from Manilius Chapman were under neither a legal nor moral obligation to pay the back taxes, or redeem the land for the benefit of the plaintiffs. Neither was there any such obligation on Manilius Chapman, for he had the same right to abandon the land to the State that the plaintiffs had, and in making his deed he did not interfere with their rights, or commit a breach of trust as to them, as it amounted to nothing more than a quitclaim deed, giving mere color of title to a tract of land long abandoned. Plaintiffs were bound to take notice of its adverse character, and to take steps in time to protect their interest and secure their inchoate legal rights.

In this suit plaintiffs occupy the contradictory position of asking that defendants' deeds, decrees, etc., be held void as clouds on their title, and yet to be held valid, so as to reinvest in them their forfeited title. Being void for one purpose, they are void for all. And, if valid against the State, they are valid against the plaintiffs, as they recognize and confirm defendants' adverse holding. A partial or ineffective redemption by a stranger, though under color of title, is void, and does not inure to the benefit of the title sought to be redeemed; and a partial and inef-

fective redemption by persons who claim adversely to the legal title is void, and cannot inure to the benefit of such holder whose title is forfeited; and although such partial redemptions are void, yet the persons making them, not being those for whose default the title was forfeited, nor their heirs or devisees, may acquire title under sec. 3 of Art. XIII of the Constitution. But this section inhibits those, their heirs and devisees, for whose laches the title was forfeited, from acquirng title or regaining the forfeited title except by full payment to the State of all the taxes for which the land was forfeited, or chargeable with during the time the forfeiture continued; and an enactment of the legislature that would permit the redemption of the title in any other way, or permit the acquirement of the state's title by the inhibited persons in any other manner short of the full payment of the taxes according to chapter 96, Acts 1872-73, would be unconstitutional and void. This doctrine does not conflict with the case of *Hall* v. *Swann*, 39 W. Va. 353, (19 S. E. 509). The only interest remaining in plaintiffs, as heretofore shown, at the time of the filing of their several bills, is a disputed, doubtful, and unexercised right of redemption accorded as a mere gratuity by the laws of the State. This is insufficient to support a suit for partition, or to remove a cloud from a forfeited title, and, equity having no general jurisdiction to permit redemption of titles forfeited to the State for nonentry on the land books, the bills ought to be dismissed as prematurely filed at the costs of the plaintiffs, they having shown no right to maintain the same. To sustain the plaintiffs' mere pretentions under the facts and circumstances of this case is to carry the doctrine of co-tenancy to an unjustifiable, unreasonable, and unconscionable extent, rewarding laches at the expense of diligence, disregarding and subverting the true principles of equitable relief, and causing a miscarriage of justice. Hence my dissent.

*Modified.*